LILLIAN STASTNY, APPELLEE, v. WILLIAM TACHOVSKY ET AL., APPELLANTS, IMPLEADED WITH FRANK M. CHAB ET AL., APPELLEES.

132 N. W. 2d 317

Filed December 31, 1964. No. 35760.

Clarence C. Kunc, for appellants.

John E. Dougherty and Stanley Bartos, for appellee Stastny.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, and BROWER, JJ., and ROBERT L. FLORY and ROBERT L. SMITH, District Judges.

BROWER, J.

This action was an equitable one in the nature of a bill of discovery brought by Lillian Stastny as plaintiff against William Tachovsky, Bessie Chab, and Elsie Kovar, individually, and Frank M. Chab and Milo S.

Stastny as special administrators of the Estate of Alfred Tachovsky, deceased, defendants, in the district court for Saline County. The plaintiff is the sole heir-at-law of Ida D. Tachovsky, deceased, and the defendants are all the heirs as well as the personal representatives of the Estate of Alfred Tachovsky, deceased.

Plaintiff's petition sought the judgment and order of the court directing the bodies of Alfred Tachovsky and Ida D. Tachovsky be exhumed and an autopsy be performed by at least two pathologists appointed by the court and directed to report in writing to it with reference to their findings. The petition makes clear its purpose was to determine from an examination of the decedents' wounds which died first in order to show in which estate the property owned by them should descend.

At the conclusion of the trial, the district court found that there was probable cause that by disinterment of the bodies and autopsies, certain facts relevant to the issues may be revealed and that justice demands said disinterment and autopsies. The judgment ordered that three acting and qualified pathologists be appointed, one by each party and a third by the court. It named and nominated a chairman of the board of pathologists who should designate the place of the autopsies. The court gave directions as to the disinterment, care, and reburial of the bodies, and required joint or several reports to be filed. It directed the plaintiff to file a bond in the sum of $1,000 conditioned that all costs of the disinterment, autopsies, and reburial be paid if finally adjudged against the plaintiff.

A motion for new trial having been overruled, the heirs-at-law of Alfred Tachovsky, hereinafter called the defendants, bring the matter to this court on appeal.

The errors assigned by the defendants as far as they are pertinent will be stated hereafter as they are discussed.

The decedents, Alfred Tachovsky and Ida D. Tachov-

sky, were married in the 1920's and then moved onto a farm located 1 mile east and a half mile south of Swanton, Nebraska, where they resided the rest of their lives. No descendants or parents survived them and their only heirs-at-law are the parties as set out. From outward appearances at least, they had always lived together in harmony. They had prospered and it is stipulated that the value of their estates amounted to $200,000 or more. Both of them had an 80-acre farm in their own name. They both were in measurably good health although both had to some degree high blood pressure which each had been able to control.

The decedents' farmstead was located on the west side of a north-south public road about 100 feet therefrom. The front of the house faced the east and the back porch was to the west. There was a fence west of the house with a gate separating the yard about the home from that around the other buildings. A cement walk about 2 feet wide led from the house to a gate in the fence, a distance of about 20 feet. The driveway from the public road to the homestead was a short distance south of the house.

About half a block south of the driveway into the decedents' farmstead is a private lane extending east and west and opening onto the public road. On this lane about a quarter of a mile west is the farmstead of Stanley Jiskra who had rented the farmland of the decedents as Alfred Tachovsky had ceased operating it personally.

The day of the tragedy, May 3, 1962, was a nice sunny day with the temperature about 55 or 60 degrees. About 7:15 or 7:20 a.m., Jiskra started to drive his tractor down the lane on his way to work because Alfred Tachovsky had requested that he discontinue using a gate between farms and come by the road. Turning into the driveway at the Alfred Tachovsky farmstead he proceeded west thereon. As he reached a point south of the house he observed Alfred Tachovsky lying on the side-

walk mentioned not far from the gate. Beside him was a .16 gauge Winchester pump gun and an empty cartridge. Another empty shell and a loaded one were later found in the gun's chamber. The body laid in a diagonal direction across the cement sidewalk. His feet were about 18 inches from a large catalpa tree south of the walk and his head was on or across the walk to the northeast. A hammer was lying near the tree and later a nail partially driven in the tree was found protruding from it.

Jiskra jumped off the tractor, "grabbed" Alfred Tachovsky by the arm, and saw he was dead. His arm was warm. The body was dressed in a short-sleeved shirt, bibbed overalls, and stockings but no shoes. Jiskra went at once to the house, opened the screen door, and "hollered" in a loud voice three times. There was no answer. Neither the homes of Alfred Tachovsky or Jiskra had telephones so he rode the tractor back to his farm and got his car. He then went to Swanton to get help to ascertain the cause of death and the whereabouts of Ida D. Tachovsky. There he called the sheriff at Wilber who was out but communicated with his wife. He also phoned Milo Stastny, the husband of the plaintiff. He stopped at the elevator for help but it was not open. Driving back he went to the home of Lester Tachovsky, a nephew but not an heir of Alfred Tachovsky, who lived about a quarter of a mile south across the road from the latter's farm. Lester had gone about 30 minutes before to assist another farmer but his wife, Jean Tachovsky, was there and she rode back with him to the scene of the tragedy. No one else had come meantime. Jean Tachovsky, after viewing the body of Alfred Tachovsky, went into the house and upstairs into the west bedroom where she was the first to discover the body of Ida D. Tachovsky. On coming down, Jiskra testified she exclaimed, " 'My God, everything is covered just with blood.' " When he asked her, " 'Is she

living?'" she answered that, "'She looks like dead to me.'"

Milo and Lillian Stastny were next to appear on the scene. They stayed but a short time. Lillian was upset and at the invitation of Jiskra, Milo drove her to Jiskra's home. Milo returned at once. Both of them were back at different times during the day but do not appear to have examined the wounds of the decedents.

The undertaker, Glenn Zajicek, was notified by the sheriff's wife that a body had been found. He picked up his assistant, Frank Bartos, and Robert Shestak, deputy sheriff of Saline County, and all proceeded to the farm in an ambulance. They found the body of Alfred Tachovsky lying as described. Being informed that Ida D. Tachovsky was lying dead upstairs, about 15 minutes later they went upstairs and viewed her body where it lay in the west bedroom. In this room there were two windows to the west with a door between opening on an upstairs veranda. The deceased, dressed in her nightclothes, was lying on her stomach on the bed, the head of which was against the north wall. The undertaker testified she was then dead. Her head was on the pillow. There was blood in her hair, about her head, on the pillow, and some on the wall. There was a wound in the back of her head, the exact location and extent of which is in considerable dispute, which will be discussed later. There was no evidence of a struggle. A search of the entire house by several witnesses failed to disclose any suicide note.

When sheriff John Tesar later learned two bodies had been discovered with signs of violence, he hurried to the Tachovsky farmstead. He viewed the bodies and thereafter released them to the undertaker who took them to the mortuary at Wilber, Nebraska, about 10 or 10:30 o'clock. They were viewed by the sheriff, county attorney, and his deputy about noon that day and the undertaker was then authorized to prepare them for burial.

Both bodies were embalmed by the undertaker in-

jecting embalming fluid into the carotid artery, and the jugular vein was raised and drainage took place through it. Two hours after this process was complete he expirated the abdominal and thoracic cavities. This procedure was done with a trocar which was inserted into the body and a hydro-aspirator took out the liquids. The undertaker cleaned out the wound on the scalp of Ida D. Tachovsky. He put about half a cup of sealing powder, a kind of pack, into the wound to keep it from leaking and some cellucotton into the cavity. The scalp being flexible he gained enough material to sew it over the wound. He put a little sealing powder in the wound of Alfred Tachovsky and sewed it up. There was no trouble getting circulation of the embalming fluid in the case of Alfred Tachovsky. Neither was there difficulty in the case of Ida D. Tachovsky. The embalming fluid reached her head and a portion oozed out of the wound. The undertaker gave it as his opinion that both bodies were properly embalmed.

Both bodies were placed in 16-gauge metal sealer-type caskets in perfect condition which would completely seal off air and moisture when closed. After the service the caskets were placed in a Wilbert concrete burial vault lined with asphalt which is likewise sealed, and they were interred in the Bohemian Cemetery west of Wilber in a location where there is good drainage.

After the bodies were taken from the house, Stanley Jiskra and John Essman, also a neighbor, on May 3, 1962, bundled up the bedding on Ida D. Tachovsky's bed in the mattress, tied it with baling wire, took it out behind the out-buildings, and burned it.

Shortly after the funeral a safe in the decedents' farmhouse was taken to Wilber and opened. In it was found a will of Alfred Tachovsky made in 1929. It left all his property to his wife, Ida D. Tachovsky.

A petition was filed to probate the will of Alfred Tachovsky. It was admitted to probate, however no appointment was made of an administrator with the

will annexed but the special administrators who are parties were appointed. There is no evidence from the county court of Saline County bearing upon the time of the respective deaths.

The events hitherto described, except as especially noted, are essentially undisputed. There are certain matters, however, concerning which there is a conflict in the evidence, or which although not in great conflict, the inferences drawn therefrom by the plaintiff or defendants are in conflict.

There is testimony concerning reports of shots heard by others as throwing light on the time of the deaths and the interval of time elapsing between the two deaths. Both Lester Tachovsky and Jean Tachovsky, living east across the road about a quarter of a mile, were called by the plaintiff to testify concerning what they had heard. Lester testified he was doing chores early in the morning on May 3, 1962. He said some time after 6 a.m., but how much after he did not know, he heard a shot, or what could have been a shot, and later said he thought there could have been what sounded like two shots. He denied that he had told anyone he heard two shots about 6:30 a.m., that morning and that they were about 3 minutes apart. He denied making statements that it sounded as if his uncle Alfred was hunting coons. Jean Tachovsky testified she saw the pigs crawling under the fence and came out to help keep them in. She heard one shot but never told Jiskra or anyone about hearing two shots, but told him she heard one and said, "I told him I thought maybe he was out hunting squirrels." Thereafter Jiskra testified when he first took Jean to the scene of the tragedy, she told him she went out to milk, Lester was chasing cattle, and they both heard two shots and that "she said, 'Well, Uncle Alfred must have been shooting coons again.' That is what she said. 'There was one shot and like you walk around a tree there was another shot.' That is what she told me." Milo Stastny and Lillian Stastny testified that while

the relatives were gathering up the chickens for disposition at the Alfred Tachovsky place about sundown on May 3, 1962, Lester Tachovsky stated in their presence and in the presence of William Tachovsky, Jiskra, and others, that while he was close to the house while getting his stock back he had heard two shots about 3 minutes apart. Jiskra testified to his giving a somewhat similar statement on the same occasion.

Another conflict concerns whether both shots could have been heard. It relates to whether or not a window in the bedroom where Ida D. Tachovsky was found was partly open. This varied between testimony that the lower part of the window was open from 6 to 8 inches and that which stated it was entirely closed, or raised to a lesser extent. Jiskra did not hear any shots. Adolph Pivonka, who was fishing three-fourths of a mile west, was called by the defendants and said he heard only one shot which was to his east a few minutes before 7 o'clock.

There was a wound in the chest of Alfred Tachovsky the size of a gun barrel. The shot did not go through the body. The wound did not bleed. There was some conflict in the evidence as to its precise location. The undertaker said it was in the middle of the chest. The deputy sheriff said he had to look a little while to find it and that it was in the chest below the lower rib a little toward the left of center. Sheriff Tesar said this wound was a shotgun wound at close range showing powder burns. He placed it about 3 inches to the left side in the second rib from the bottom up.

The testimony relative to the wound in the head of Ida D. Tachovsky is not in harmony. The undertaker, Glenn Zajicek, with 14 years experience, testified there was a wound in the back of the head more to its left side going from the back to the front at an angle from the left side of the head to the front. It was not to the face but just a little above the ear which was not damaged. Some of it went above the ear at an angle from the back up to the side. It was the size of a bigger orange

and its edges were irregular. The sheriff, John Tesar, said it was between the ears and a jagged wound. It was all torn up. The wound was 2½ inches wide and 4 or 5 inches long. It was lower than the ears starting next to the left ear but went past the center of the head towards the right. Jiskra said the wound was near the center of the head. Shestak, the deputy sheriff, from a rather superficial examination at the mortuary located the wound at the left rear of her head right behind the ear in the lower brain.

With respect to the warmth in the two bodies, Jiskra said when he took Alfred's arm it was warm. The undertaker said Ida's body was still warm when he went upstairs 15 minutes after he arrived about 8 o'clock. She was partly covered with bedclothes, however, but her whole body was warm. He stated it would be hard to compare the warmth of the two bodies, that Alfred's body was warmer under his clothing but the outside temperature would lower his arms and face. The deputy sheriff said Alfred Tachovsky's arms were cold, and he went up twice where Ida's body was and her arm was turning cool but was still a little warm. Her left arm was covered but not her right.

The testimony fails to show that any rigor mortis had set in until the embalming of the bodies was started about noon at which time it had started on both bodies to the same extent.

In contrast to the body of Alfred Tachovsky which did not bleed externally, all the witnesses who viewed the body of Ida D. Tachovsky said there was a great deal of blood in her hair and on her head, pillow, and bedding. The sheriff testified to the blood and some brains on the bedding. Some others spoke of tissue but not of brains. The estimates of the blood ranged from a pint to two quarts. The undertaker testified, however, that he considered a normal amount of blood remained in both bodies. There was also a protrusion of one of Ida's eyes and it was black and blue which was testified to

by the undertaker who stated it indicated that from the blow, blood was pumped to the eye. During normal death there would be no protrusion.

The deposition of Dr. Henry Halley, a qualified pathologist, taken by the plaintiff was read in evidence. From his testimony it appears that an injury to the upper portion of the brain might not cause death for some time. He said persons have lived for a long time after portions of the upper brain were removed after injury. An injury to the lower portion of the brain, the medulla oblongata, and the ponds which connect with the spinal cord and control involuntary action such as the blood pressure, breathing, balance, walking, and so forth, would probably cause immediate death.

If a post mortem were performed he gave it as his opinion that it would be possible to determine the time each of the decedents survived their wounds although this depended on what was found. In the case of the woman, it would depend on the condition of the brain and lungs. The importance of the lungs arises because if one survives a serious wound for "say a period of five or ten minutes or longer," the lungs would tend to get convexed with blood and wet with edema fluid, and if a person lives long enough there often developes clearcut hypostatic bronchial pnuemonia. Conclusions as to the time of survival may be drawn from the lungs' condition. It is the condition of the tissue in the lungs, not the fluid, that the pathologist takes into consideration. The length of survival in case of the woman would also depend on the extent of the damage to the brain and that portion damaged. If the brain is poorly preserved, a pathologist can still draw conclusions as to the force and direction of the gunshot from what has happened to the skull which would be well preserved. If the pellets, or shot, had been diverted from their course or pattern in passing through the brain, it would be shown on the skull.

His opinion about the time the man might have sur-

vived would depend upon whether the heart was involved in the blast, the extent of the damage to it and the aorta, and the loss of blood occasioned by the wound and whether it came from the heart, the aorta, or liver. One could detect whether the wound was instantly mortal, or mortal after a period of time.

He gave it as his opinion that in the absence of some observer to determine the precise moment when the pulse failed in these individuals, the only other way is by a post-mortem examination. Any examination based on external observation made could be misleading. He further stated that he saw no serious obstacle to a pathologist arriving at an opinion although the autopsy was postponed from the date of the tragedy to the trial or for a reasonable time thereafter. It would depend upon the evidence that was found as to whether he could give a clear-cut opinion. He stated further, "In my experience, neither kind of (arterial or cavity) embalming will alter or change that which existed, say at the time of death. However, it takes more skill to recognize the work after cavity work."

On cross-examination he said that hemorrhaging implies life but that if certain great veins inside the skull were torn there would be nothing to keep them from leaking and flowing by gravity up to the point that the blood clots. Further, that in some cases where a person developed a state of shock there was something that developed in the system to keep the blood from clotting. His testimony would indicate that conclusions to be drawn from the amount of blood lost would require careful consideration. He did not advise autopsies because he thought the time of death would be stated to the exact minute. That would be approaching the problem with misinformation. His opinion would be based on the evidence that he observed and he would try to put a minimum and maximum time on the period of survival. If he knew that a person's heart stopped like that, he would say that he died in a minute. In other cases the

evidence might justify an opinion that a person survived 10 to 30 minutes, or from 30 to 60 minutes, or some such period. There was no other testimony of a pathologist.

We find no case where this court has considered the exhumation of dead bodies for the purpose of discovering evidence. The question, however, has been discussed in texts and cases from other jurisdictions, and pertinent rules have been formulated.

In 27 C. J. S., Discovery, § 1, p. 6, there is a discussion of the nature of discovery in equity where it is said: "Discovery is the disclosure of facts, deeds, documents, or other things in the exclusive knowledge or possession of one party, which are necessary to the party seeking discovery as a part of a cause of action or defense in an action pending, or to be brought in another court, or as evidence of his rights or title in such proceedings."

Discovery may be invoked as an ancillary or auxiliary remedy, an equitable action, sometimes referred to as a "pure bill of discovery," which seeks no relief in consequence of the discovery, but seeks the disclosure of facts resting in the knowledge of defendant, or of deeds, writings, or other things in his custody or power, merely in aid of the prosecution or defense of some other proceeding, usually at law, pending or about to be brought. 27 C. J. S., Discovery, § 1, p. 7; Marshall v. Rowe, 126 Neb. 817, 254 N. W. 480; Mutual Life Ins. Co. of New York v. Griesa, 156 F. 398.

In 8 Wigmore on Evidence, McNaughton Revision, § 2221, p. 197, it is stated: "The exhumation or the autopsy of a corpse, when useful to ascertain facts in litigation, should of course be performed. Reverence for the memory of those who have departed does not require us to abdicate the high duty of doing justice to the living; and the orders of a court of justice, exercising the power of the state in the communal interest, are not to be placed on the same level with the acts of an unlicensed and self-seeking intruder upon hallowed ground." Section 2217, page 168, of the same volume

states: "The exhumation of a corpse, often a material assistance in insurance or inheritance cases, is demandable on this principle, subject of course to the trial court's discretion as to necessity and propriety." Other texts agree with that cited. 15 Am. Jur., Dead Bodies, § 19, p. 841; 25 C. J. S., Dead Bodies, § 4, p. 1019.

In Kusky v. Laderbush, 96 N. H. 286, 74 A. 2d 546, 21 A. L. R. 2d 536, the following rules were determinative of the court's decision: " '(T)he quiet of the grave, the repose of the dead, are not lightly to be disturbed. Good and substantial reasons must be shown before disinterment is to be sanctioned.' * * * However, 'the right to have a dead body remain unmolested is not an absolute one; it must yield where it conflicts with the public good or where the demands of justice require such subordination.' " The court also said: "If the interests of justice demanded it, the Trial Court had the authority in the exercise of a sound discretion to order an autopsy." An order for an autopsy upon motion of a party in a civil action is not necessarily precluded by the fact that other sources of evidence exist on the subject. The opinion cites cases in support of each proposition of law in this paragraph stated. It was held in the cited case that the trial court erred in not ordering an autopsy in a suit involving injuries to a deceased person where the plaintiff asserted the death was caused solely by an automobile accident and the defendant maintained it arose from cancer. There is an annotation appended to Kusky v. Laderbush, *supra,* in 21 A. L. R. 2d 538, where many cases are discussed concerning the power of a court to order disinterment and autopsy or examination for evidential purposes in civil cases. They include In re Percival, 101 S. C. 198, 85 S. E. 247, where the state sought to obtain property by escheat on the ground that a person died without heirs, and it was held the court had power to order exhumation and examination of the body for identification marks, at the instance of one who had produced prima facie evidence of her

claim that she was the mother of the deceased.

The defendants cite cases, some but not all of which are taken from the annotation at 21 A. L. R. 2d 538, where exhumation and autopsy were not permitted. Those that involve discovery are generally cases where the court considered under the evidence before it that an autopsy if performed would avail nothing. Such is the case of State ex rel. Meyer v. Clifford, 81 Wash. 324, 142 P. 472, Ann. Cas. 1916D 329, where exhumation was not permitted to show that the deceased was incapable of being the father of certain persons who claimed to be his children and heirs because it was asserted the deceased had been castrated. The court held if exhumed the condition of the body at the time of the conception of the children would not be shown and that he had admitted the paternity in writing in any event which was conclusive under a cited statute. A discussion of such cases would extend this opinion unnecessarily. In most all of such cases the court made it clear its ruling should not be construed as preventing exhumation and an autopsy in a case where justice would require it.

The defendants refer to other cases where exhumation was denied which do not involve discovery. These are contests wholly relating to the proper place of burial or the proper person to designate such burying place. Some of these apparently deny the right to have the body exhumed although the person seeking it was the proper one to have chosen the place of interment. These rulings are based on the sanctity and inviolability of the sepulcher. They are not applicable to the case before us involving discovery.

In Mutual Life Ins. Co. of New York v. Griesa, *supra,* it was determined that the federal statute then existing was not sufficient to authorize an exhumation and autopsy but it further held a court of equity had such power in a purely ancillary action for the purpose of obtaining evidence required in a law action.

The defendants assign error to the trial court in en-

tering judgment alleging it had no jurisdiction over the subject matter and no action was pending before it to which its findings would be relevant. They argue in their brief that the determination of heirship is wholly within the province of the county court and that in this state the county court has equitable powers and the action should have been brought in that court. The authorities previously cited clearly hold that a court of equity has authority to entertain an ancillary action for the purpose of discovery in such cases. In Mutual Life Ins. Co. of New York v. Griesa, *supra,* the circuit court of the district of Kansas held that under the Kansas law the county court had no such jurisdiction in a case involving exhumation. It is not necessary for us to determine whether our county courts have such jurisdiction. It affirmatively appears from the cases cited that courts of general equity jurisdiction have such power and it follows that it may be exercised by the district courts in this state. The assignment cannot be sustained.

The defendants further contend the trial court erred because it had no authority in law to order the exhumation of bodies or an autopsy. From the authorities cited the contention is also without merit.

Defendants further state that the trial court was in error in that the judgment was not sustained by the evidence. They argue the evidence clearly shows Ida D. Tachovsky suffered instant death and could not have survived Alfred Tachovsky, and that an autopsy would show nothing material or relevant concerning the relative time of death of the decedents. From the evidence it is obvious that Alfred Tachovsky murdered his wife, Ida D. Tachovsky, on May 3, 1962, and went downstairs and into the yard where he committed suicide. No person was present when either decedent died. They were both dead when their bodies were discovered. The exact time when the lethal shots were fired is not fixed with certainty. Whether their respective wounds resulted in immediate death is not shown. The under-

taker stated it would be difficult from the warmth of the bodies to estimate the relative time of the deaths. The evidence is not in harmony as to the exact location of the wound of Ida D. Tachovsky. A similar conflict exists as to the exact location of the wound in the chest of Alfred Tachovsky. There is no medical testimony by doctors who examined the bodies before burial. The plaintiff and her husband had little opportunity to examine the wounds. Several of the lay witnesses testified from viewing them in haste. The only expert evidence is that of a pathologist. From his testimony either of the decedents might have died immediately. His evidence on the other hand indicates that either one of them might have survived his wounds for some time depending upon the exact location of the injuries to the respective decedent. He states that a disinterment and autopsy at the time of the trial or for a reasonable time thereafter by a qualified pathologist would indicate whether either of them died instantly. It might also be determined therefrom that one of them survived for a certain interval of time which could be stated within certain expressed limits. He further indicates that embalming, whether of an arterial or cavity nature, would not prevent a qualified pathologist from making a finding as to the length of time the decedents survived their wounds although it would require more skill to do so. There is no contrary evidence by a qualified pathologist. There is evidence indicating that both of the lethal shots occurred within a space of 3 minutes, or a very short time. It follows that it might be determined that Ida D. Tachovsky survived her husband, or the contrary might be shown by an autopsy. Under the circumstances there is, in our opinion, evidence sufficient to sustain the trial court in finding that an exhumation and autopsy might present facts concerning the relative time of survival of the decedents and that justice requires the pertinent evidence be shown. The contention of the defendants that there is no evidence to support the judgment cannot

be sustained. We think there is such evidence in the record and that it is sufficient.

A considerable portion of the briefs are devoted to whether or not the evidence concerning the interval of time between the shots heard was admissible to impeach the testimony of Lester and Jean Tachovsky who were called by the plaintiff. Plaintiff claims they were hostile witnesses. This question need not be discussed. The evidence was repeatedly received without proper objection. Error in its reception was not asserted as a ground for new trial. The evidence is properly in the record.

The defendants assign error to the trial court's ruling in refusing to grant the defendants a continuance to procure the testimony of a pathologist. The trial court on its own motion set the case for hearing on September 6, 1963. By stipulation filed September 5, 1963, it was agreed it should not be tried on that date but was continued by consent of parties for 20 days, or such other time thereafter as the court should set it for hearing. On October 23, 1963, the deposition of the plaintiff's pathologist was filed. The case was set by the court to be tried commencing December 10, 1963. In his opening statement defendants' counsel stated he was giving notice that he intended to ask the court for continuance to obtain the deposition of certain qualified pathologists. At the conclusion of the defendants' testimony such a motion for a continuance was first made. It was objected to by the counsel for the plaintiff. The defendants at no time filed a written application and affidavit for continuance as provided in section 25-1148, R. R. S. 1943. The defendants gave no notice of any application for continuance until the morning of trial. They had ample time in which to procure such evidence and to prepare for trial. The ruling of the trial court with respect to the continuance was proper and the contention of the defendants is without merit.

A consideration de novo of the law and the evidence

by this court convinces us that the exhumation and autopsy should be performed in the interest of justice and that the judgment of the trial court should be and is affirmed.

AFFIRMED.