MOZELLA WILLIAMS, PERSONAL REPRESENTATIVE OF THE ESTATE OF VERGIL WILLIAMS, DECEASED, APPELLANT, V. GOULD, INC., ET AL., APPELLEES, SIDNEY LERNER, M.D., APPELLEE AND CROSS-APPELLANT.
TYREE BIGGS, SR., APPELLANT, V. GOULD, INC., ET AL., APPELLEES, SIDNEY LERNER, M.D., APPELLEE AND CROSS-APPELLANT.
ULYSSES ABBOTT, APPELLANT, V. GOULD, INC., ET AL., APPELLEES, SIDNEY LERNER, M.D., APPELLEE AND CROSS-APPELLANT.

443 N.W.2d 577

Filed July 21, 1989.   Nos. 87-703, 87-704, 87-705.

Martin A. Cannon, of Matthews & Cannon, P.C., and Eugene Mattioni, of Mattioni, Mattioni & Mattioni, Ltd., for appellants.

William M. Lamson, Jr., and Patricia A. Zieg, of Kennedy, Holland, DeLacy & Svoboda, for appellee Lerner.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ., and RIST, D.J., and COLWELL, D.J., Retired.

SHANAHAN, J.

The appellants, Tyree Biggs, Sr., Ulysses Abbott, and Mozella Williams, who is the surviving spouse and personal representative of the estate of Vergil Williams, filed their separate actions in the district court for Douglas County, Nebraska, against Gould, Inc., Robert J. Fitzgibbons, Sr., M.D., and Sidney Lerner, M.D., concerning bodily injuries caused by exposure to lead, cadmium, and arsenic at Gould's smelter in Omaha.

*The Petitions.*

In substantially identical petitions, appellants alleged the relationship of the parties and the basis for appellants' actions. Gould, which operated its smelter in Omaha, was not a Nebraska corporation, but had its principal place of business in Minnesota. Gould employed Lerner, an Ohio citizen, as a medical consultant "for the ostensible purpose of examining workers at the Gould plant in Omaha, and informing them of and protecting them from the hazards" of contact with or exposure to toxic substances encountered in Gould's smelter operations. Lerner's employment also included "overseeing plant and corporate policy in regard to biological and industrial monitoring and the health and maintenance of workers exposed to toxins at the lead smelting and refining plant of Gould, Inc." Gould also employed Fitzgibbons, a Nebraska citizen, as a

medical consultant and health care provider for Gould's Omaha employees. According to the appellants, Lerner and Fitzgibbons "failed to conduct their activities with the acceptable standards of medical care," with the result that the physicians' "careless, wanton and reckless acts and omissions" caused permanent bodily injury to Biggs and Abbott and resulted in Vergil Williams' death. Each appellant requested damages from the defendants.

*Long-Arm Statute.*

Pursuant to the Nebraska "long-arm statute," Neb. Rev. Stat. § 25-536 (Reissue 1985), appellants served summons on Lerner. See, Neb. Rev. Stat. § 25-505.01 (Reissue 1985) (service of summons); Neb. Rev. Stat. § 25-540 (Reissue 1985) (service of summons outside Nebraska). Section 25-536 provides:

A court may exercise personal jurisdiction over a person:

(1) Who acts directly or by an agent, as to a cause of action arising from the person:

(a) Transacting any business in this state;

(b) Contracting to supply services or things in this state;

(c) Causing tortious injury by an act or omission in this state;

(d) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;

(e) Having an interest in, using, or possessing real property in this state; or

(f) Contracting to insure any person, property, or risk located within this state at the time of contracting; or

(2) Who has any other contact with or maintains any other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

*Special Appearance.*

Lerner filed a special appearance in the actions, objecting to personal jurisdiction by a Nebraska court "for the reason that the Court is without jurisdiction of this Defendant in that this

Defendant has had insufficient minimum contact with the State of Nebraska sufficient to satisfy the due process requirements of the United States Constitution and Nebraska Constitution." *Hearing on Special Appearance.*

At the hearing on Lerner's special appearance, the parties offered affidavits concerning the question of personal jurisdiction over Lerner.

On May 21, 1975, Lerner, an expert on the medical aspects of occupational lead exposure and a resident of Cincinnati, Ohio, wrote to J.E. Gillan, Gould's corporate safety director, in Rolling Meadows, Illinois. In that letter, Lerner expressed his willingness to become Gould's corporate "Medical Lead Consultant," and stated his views about the prospective position:

> In my view, the Corporate Medical Lead Consultant should serve in an advisory and functional rather than administrative capacity. He should be identified as an independent medical consultant rather than company employee. He should report to a single individual in the corporate headquarters, but at the same time be directly available to a reasonable number of others within the organization.
>
> Services could be provided in a number of areas based on the identified needs. These may include one or more of the following:
>
> 1. Development of corporate policy and medical guidelines for company physicians responsible for the health maintenance of lead workers.
>
> 2. Assist company physicians in the medical management and evaluation of employees with increased absorption of lead with and without clinical effects.
>
> 3. Help assure precision and accuracy of laboratory analysis for lead and other biological tests.
>
> 4. Consult with an employee's personal physician and his representatives (only with Gould approval) with regard to health effects of lead.
>
> 5. Participate in the implementation of the industrial hygiene and safety aspects of the health program for lead.
>
> 6. Keep abreast of medical and medico-legal

developments relating to lead and report these to the company with interpretations and recommendations.

7. Periodically monitor and evaluate existing programs and assist in assuring compliance with company policies and governmental regulations relating to the health maintenance of lead workers.

8. Indoctrinate workers regarding health effects of lead and respective roles of management and labor in the safe handling of lead.

. . . .

At present I could travel a couple of days a month and devote about 4-5 hours per week to Gould in my office. There is some flexibility in these times. I would suggest an annual retainer of $12,000 for work in Cincinnati and $400/day plus expenses for consulting out of Cincinnati. . . .

With the travel schedule as outlined it may take over two years to visit all seventeen plants since I expect other trips for Gould would become necessary in the interim. The nature and level of activity for years after the first or second could best be defined following our mutual experience.

. . . .

. . . I would be happy to answer any further questions and do look forward to the development of a productive and pleasant association.

Gould operated 17 plants throughout the United States, including its smelting and refining plant in Omaha, where Gould refined and separated lead-based scrap and other heavy metals. In September 1975, Gould retained Lerner as its "Medical Lead Consultant" for the services indicated in Lerner's letter of May 21. Gould's "Safety Bulletin," issued by Gillan on September 12, 1975, notified Gould's safety personnel that Lerner was Gould's "Medical Lead Consultant," who would provide professional services in the eight areas mentioned in Lerner's letter to Gillan. Additionally, the safety bulletin stated:

Gould has contracted for approximately twenty hours per month consultant service through telephone and mail

contact with Dr. Lerner at his Cincinnati office. In addition, the Doctor can be scheduled to visit individual plants, laboratories or divisional offices. . . . It is our expectation that visits can ultimately be arranged to all locations having serious medical lead problems or the potential for developing such problems.

Our objective is to encourage direct contact with Dr. Lerner, especially as regards plant physicians involved in the treatment or evaluation of company employees. However, to assure effective administration of this service, we request that all initial contacts be made through Corporate Safety.

According to Fitzgibbons, who is a "licensed physician residing and practicing in Omaha, Douglas County, Nebraska," since 1963 he has provided "medical care and treatment to employees of Gould" and, in connection with those services, "Gould, Inc. advised me to confer with . . . Dr. Sidney Lerner . . . ." Fitzgibbons stated that "I would confer from time to time with Dr. Sidney Lerner through telephonic communication" and that "[g]enerally, telephonic communication with Dr. Lerner would be initiated by me, however, Dr. Lerner would return my calls in the event he was not in during those calls which I initiated."

Vergil Williams entered employment at Gould's Omaha smelter in 1964; Biggs in 1971; and Abbott in 1976. Each remained in Gould's employment, which exposed them to lead, cadmium, and arsenic, until Gould closed its Omaha smelter in 1982.

Nothing showed that Lerner was ever physically present in Nebraska concerning his activities as Gould's "Medical Lead Consultant" pursuant to the Lerner-Gould contract entered in 1975.

*Excluded Affidavits and Dismissal.*

At the special appearance hearing, Lerner's lawyer offered the affidavits of Lerner, Gillan, and a Joseph Beemster.

According to Lerner's affidavit, he is an Ohio resident with a specialty in "Occupational Medicine," has no property in Nebraska, is not licensed to practice medicine in Nebraska, has never practiced medicine in Nebraska or treated any Nebraska

patient, and "never tried to solicit or otherwise develop any business in Nebraska [nor] advertised my services in Nebraska." Lerner stated that "[n]o formal contract was ever signed between myself and Gould," that he monthly "billed for my retainer," but his "fee didn't depend upon my furnishing services in Omaha," and that he "never visited [or was] asked to visit the Gould plant in Omaha, Nebraska." However, Lerner recalled his 1980 examination of medical records pertaining to a Benare James, an employee and workers' compensation claimant at Gould's Omaha smelter, although the James records were forwarded by an industrial hygienist in Minnesota. Lerner never had any direct contact with James. However, between 1980 and 1983 Lerner wrote to various people concerning James, including Gould's claim adjuster, and a representative of CNA, the insurance company which provided workers' compensation coverage for Gould. Among the appendages to Lerner's affidavit was a copy of a memorandum containing Lerner's notes in a telephone conversation with Fitzgibbons. The notes refer to three Gould employees, Neil Armstrong, Wm. Harris, and Marvin Love, and contain the descriptive terminology "cramping, aching," "lead poisoning," "chest x-ray," and "intestinal pneuminitis."

Gillan was Gould's "director of corporate safety" from 1974 until his retirement in 1984, and, in his affidavit, asserted that "[n]o formal contract was ever executed between Gould and Dr. Lerner" and "Dr. Lerner's relationship with Gould is best described as a 'Texas handshake deal.' " Gillan's affidavit also contained: "Although plant managers and local plant physicians were free to consult with Dr. Lerner regarding the health and medical treatment of an employee, Dr. Lerner had no authority, without prior approval from Gould, to examine or treat individual employees."

The Beemster affidavit contained statements that Beemster was a former "Director of Health and Safety" for Gould and that he did not "recall ever having any conversation with Dr. Lerner regarding any matters pertaining specifically to the Omaha plant."

When the court asked whether there was an objection to the three affidavits (Lerner, Gillan, and Beemster), Eugene

Mattioni, one of appellants' lawyers, commented:

I think, Your Honor, except that we may have a caveat to the proceeding today that it may be, because it is a very important issue, that the depositions of these three gentlemen should be taken . . . that possibly it should be reserved that these persons be subject to deposition to review with them the jurisdictional question that is at issue.

Precluding a continuance for the depositions suggested or proposed by Mattioni, the court remarked: "Well, actually, Mr. Mattioni, our procedure is that when we're here for a hearing, we are here for the hearing and are supposed to have our evidence available."

At that point Mattioni objected to the affidavits offered by Lerner and addressed the court: "We would move that we would want the deposition testimony of Dr. Lerner, Mr. Beemster and Mr. Gillan." Later, the court sustained the appellants' objection and excluded the three affidavits offered by Lerner because the court concluded that an affidavit, in reference to disposition of a special appearance, was not permitted under Neb. Rev. Stat. § 25-1244 (Reissue 1985), which provides: "An affidavit may be used to verify a pleading, to prove the service of a summons, notice or other process, in an action, to obtain a provisional remedy, an examination of a witness, a stay of proceedings, or upon a motion, and in any other case permitted by law." The court then found that "there have been insufficient minimum contacts by Defendant Lerner with the State of Nebraska to warrant this Court in assuming jurisdiction over Defendant Lerner," sustained Lerner's special appearance, and dismissed appellants' action against Lerner.

*Assignments of Error.*

In their appeal, appellants claim that the court erred in sustaining Lerner's special appearance and dismissing their actions and further contend that the court should have allowed appellants a continuance to obtain the depositions of Lerner, Gillan, and Beemster concerning the jurisdictional question.

Lerner cross-appeals and claims that the court erred in refusing to admit the affidavits of Lerner, Gillan, and Beemster.

## STANDARD OF REVIEW

When determination of a jurisdictional question involves factual findings, a trial court's decision on the question of jurisdiction will be upheld unless the factual findings concerning jurisdiction are clearly incorrect. Cf. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986) (bench trial; law action). When a jurisdictional question does not involve a factual dispute, determination of the jurisdictional issue is a matter of law, which requires an appellate court to reach a conclusion independent from the trial court's conclusion on the jurisdictional issue. See, *Huffman v. Huffman, ante* p. 742, 441 N.W.2d 899 (1989) (jurisdictional issue; proceedings for dissolution of marriage); *Lutheran Medical Center v. City of Omaha*, 229 Neb. 802, 429 N.W.2d 347 (1988); *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986). See, also, *Cubbage v. Merchent*, 744 F.2d 665 (9th Cir. 1984). Confronted with a special appearance, a plaintiff has the burden to establish facts which demonstrate the court's personal jurisdiction over the defendant. *Droukas v. Divers Training Academy, Inc.*, 375 Mass. 149, 376 N.E.2d 548 (1978); *Phelps v. Kingston*, 130 N.H. 166, 536 A.2d 740 (1987).

## AFFIDAVITS RELATIVE TO A SPECIAL APPEARANCE

This court has held that a *motion*, as the term is used in § 25-1244, relates to "preliminary, collateral and interlocutory matters." *Banks v. Metropolitan Life Ins. Co.*, 142 Neb. 823, 834, 8 N.W.2d 185, 191 (1943). Cf. *State v. Howard*, 184 Neb. 461, 168 N.W.2d 370 (1969) (affidavit may be used to show unavailability of a witness and permit use of the absent witness' prior testimony).

Before any other pleading or motion, a defendant may file a special appearance for the sole purpose of objecting to a court's assertion or exercise of personal jurisdiction over the defendant. *West Town Homeowners Assn. v. Schneider*, 221 Neb. 674, 380 N.W.2d 265 (1986); *Swick v. Coslor*, 194 Neb. 781, 235 N.W.2d 639 (1975). A special appearance may be based on the absence of a defendant's amenability to process issued by

a Nebraska court. See, *West Town Homeowners Assn., supra*; *Wendt v. Yant Construction Co.*, 125 Neb. 277, 249 N.W. 599 (1925). See, also, Neb. Rev. Stat. § 25-516.01(2) (Reissue 1985):

> Prior to filing any other pleading or motion, a special appearance may be made for the purpose of objecting to the jurisdiction of the court over the person of the defendant. The defendant's assertion of a claim for affirmative relief by way of counterclaim, cross-claim, or third-party claim waives any objection that the court erred in overruling the special appearance. The defendant's participation in proceedings on any issue other than jurisdiction over the person waives any objection that the court erred in overruling the special appearance except the objection that the defendant is not amenable to process issued by a court of this state.

A special appearance is analogous to a plea in abatement. *West Town Homeowners Assn., supra*; *Insurance Co. of North America v. Kunin*, 175 Neb. 260, 121 N.W.2d 372 (1963). A plea in abatement does not go to the merits of an action, but, by presentation of facts extrinsic to the merits of an action, demonstrates irregularities or circumstances which preclude further prosecution of the action or require suspension of the proceedings. See, *State v. Ludwig*, 143 Neb. 278, 9 N.W.2d 292 (1943); *White v. Pottawatomie County*, 199 Okla. 103, 184 P.2d 446 (1947); *United States v. Brodson*, 234 F.2d 97 (7th Cir. 1956).

An affidavit may be used to prove or disprove proper service when a special appearance is based on a defect in the service of process. *Erdman v. National Indemnity Co.*, 180 Neb. 133, 141 N.W.2d 753 (1966); *State v. Tautges, Rerat & Welch*, 146 Neb. 439, 20 N.W.2d 232 (1945); *Johnson v. Carpenter*, 77 Neb. 49, 108 N.W. 161 (1906).

We hold that a special appearance, which is preliminary and collateral to determining the merits of an action, is a pleading within the purview of § 25-1244. Consequently, in a hearing on a special appearance, an affidavit may be used to prove or disprove the factual basis for a court's assertion or exercise of personal jurisdiction over a defendant. Therefore, the district court erred in excluding the affidavits offered by Lerner to

support his special appearance. In sum and substance, the excluded affidavits emphasize that Lerner was never physically present in Nebraska and that Lerner "never tried to solicit or otherwise develop any business in Nebraska [nor] advertised [his] services in Nebraska," but definitely underscore the fact that Lerner and Gould contracted for Lerner's professional services as a specialist in occupational medicine pertinent to Gould and its employees.

Therefore, in disposing of the present appeals, inasmuch as the excluded affidavits contained appropriate information on the jurisdictional issue, we consider the affidavits excluded by the district court.

## JURISDICTION THROUGH LONG-ARM STATUTE

Before a court can exercise personal jurisdiction over a nonresident defendant, the court must, first, determine whether a statutory standard of the long-arm statute is satisfied, and, if the long-arm statute has been satisfied, second, whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process. *Sherburne Cty. Social Serv. v. Kennedy*, 426 N.W.2d 866 (Minn. 1988); *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223 (8th Cir. 1987); *Phelps v. Kingston*, 130 N.H. 166, 536 A.2d 740 (1987); *Raffaele v. Compagnie Generale Maritime*, 707 F.2d 395 (9th Cir. 1983).

## LERNER'S CONTRACT WITH GOULD

Although there was no formal agreement signed by Lerner and Gould, there is no dispute that a contract existed between Lerner and Gould, which called for Lerner's compensated services as a physician and consultant on occupational medicine relative to Gould's smelter operations, wherever those activities were conducted in Gould's business network. As far as Nebraska was concerned, the Lerner-Gould contractual relationship existed from 1975 until Gould closed its Omaha smelter in 1982, although the James workers' compensation claim indicates Lerner's medical involvement with a Nebraska resident as late as 1983. Obviously predicated on Lerner's expertise in occupational medicine, one of Lerner's contractual obligations was: "Assist company physicians in the medical

management and evaluation of [Gould's] employees with increased absorption of lead with and without clinical effects." Gould encouraged its "plant" physicians, involved in the treatment or evaluation of company employees, to draw on Lerner's special knowledge about toxins encountered in Gould's smelter operations. In discharging his obligation to render professional services pursuant to the Gould contract, Lerner actually discussed medical questions over the telephone with Fitzgibbons, Gould's "company" physician in Omaha. In the industrial context of the Lerner-Gould contract, the conclusion is inescapable that Fitzgibbons incorporated Lerner's expertise and advice into Fitzgibbons' "medical care and treatment to employees of Gould, Inc.," in Omaha. For his medical consultations and advisory services for Gould's "company" physicians, Lerner received an annual retainer and a daily fee.

Nebraska's long-arm statute, § 25-536, provides: "A court may exercise personal jurisdiction over a person: (1) Who acts directly or by an agent, as to a cause of action arising from the person: . . . (b) Contracting to supply services or things in this state . . . ."

In *Lupton Assoc. v. Northeast,* 105 A.D.2d 3, 482 N.Y.S.2d 647 (1984), a Massachusetts corporation contracted with a New York corporation that the latter would " 'use its best efforts to promote, develop and extend the sale of [defendant's] products' " in the northeastern United States in exchange for a commission on the net sale price of all goods sold. *Id.* at 4, 482 N.Y.S.2d at 649. The New York long-arm statute provided for personal jurisdiction by acts of nondomiciliaries, when a cause of action arose from the enumerated acts in the statute, viz, "transacts any business within the state or contracts anywhere to supply goods or services in the state." *Id.* at 5, 482 N.Y.S.2d at 649. The court concluded:

New York courts may now exercise jurisdiction over a nondomiciliary who contracts outside this State [New York] to supply goods or services in New York even if the goods are never shipped or the services are never supplied in New York, so long as the cause of action, as here, arose out of that contract . . . .

*Id.* at 6, 482 N.Y.S.2d at 650. See, also, *Drake America Corp. v.*

*Speakman Co.,* 144 A.D.2d 529, 534 N.Y.S.2d 679 (1988).

South Carolina's long-arm statute was involved in *Kimbrel v. Neiman-Marcus,* 665 F.2d 480 (4th Cir. 1981), when Kimbrel, a South Carolina resident, commenced an action in South Carolina against Neiman-Marcus, a Texas corporation, concerning a contract with Neiman-Marcus for paintings owned by Kimbrel. The South Carolina long-arm statute, in pertinent part, provided that a court in South Carolina may exercise personal jurisdiction over a defendant who acts directly or by an agent as to a cause of action arising from the person's " 'entry into a contract to be performed in whole or part by either party in this state.' " 665 F.2d at 481. In *Kimbrel,* the court concluded that the South Carolina long-arm statute afforded personal jurisdiction over the nonresident defendant.

See, also, *Powder Horn Nursery, Inc. v. Soil & Plant Lab., Inc.,* 20 Ariz. App. 517, 514 P.2d 270 (1973) (service of process upheld under Arizona's long-arm statute, which provided a corporate defendant " 'which has caused an event to occur in this state out of which the claim which is the subject of the complaint arose,' " *id.* at 519, 514 P.2d at 272; a California laboratory sent its horticultural recommendations and advice to the Arizona plaintiff, which used the information to its damage in raising nursery stock in Arizona); *Wolpert v. N. Shore University Hosp.,* 231 N.J. Super. 378, 555 A.2d 729 (1989) (a New Jersey court had personal jurisdiction over a New York physician who issued a report and intended that the report would be the basis for action in New Jersey).

Under the contract between Lerner and Gould, Lerner assumed the obligation to consult with and advise Gould's "company" physicians, who included Fitzgibbons in Omaha. The contract also obligated Lerner to "[p]articipate in the implementation of the industrial hygiene and safety aspects of the health program for lead" at Gould's plants, which included the Omaha smelter operations. If Lerner's special knowledge was his stock in trade, Lerner contracted to market his product in Nebraska when he agreed to supply, and actually did supply, medical information to a Nebraska physician for the health care of Gould's Omaha employees. Although Lerner did not contract to deliver a tangible product in Nebraska,

nevertheless, Lerner's expertise and professional advice, supplied to a Nebraska physician for the care and treatment of Gould's Omaha employees in fulfillment of the Lerner-Gould contract, constituted Lerner's "[c]ontracting to supply services or things" in Nebraska. § 25-536(1)(b). Therefore, we conclude that the Nebraska long-arm statute, § 25-536(1)(b) and (2), applies on account of Lerner's conduct and activity under his contract with Gould; hence, the first requisite for a court's assertion or exercise of personal jurisdiction over a nonresident defendant has been satisfied. See, *Sherburne Cty. Social Serv. v. Kennedy*, 426 N.W.2d 866 (Minn. 1988); *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223 (8th Cir. 1987); *Phelps v. Kingston*, 130 N.H. 166, 536 A.2d 740 (1987); *Raffaele v. Compagnie Generale Maritime*, 707 F.2d 395 (9th Cir. 1983).

## MINIMUM CONTACTS

Because Lerner's conduct comes within the purview of the long-arm statute, § 25-536, we must now consider whether a Nebraska court's assertion or exercise of jurisdiction over Lerner is consistent with due process.

In *McGowan Grain v. Sanburg*, 225 Neb. 129, 403 N.W.2d 340 (1987), we acknowledged that due process for personal jurisdiction over a nonresident defendant requires the defendant's minimum contacts with the State of Nebraska so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). To determine whether a court has personal jurisdiction over a nonresident defendant, the court must examine the quality and nature of the nonresident's activities and ascertain that the nonresident has sufficient minimum contacts with the forum state to satisfy the requisite due process for assertion or exercise of personal jurisdiction. *Internat. Shoe Co. v. Washington, supra.*

Fairness and reasonableness, essential to due process in personal jurisdiction over a nonresident defendant, require that the defendant's contact with the forum state must be of a quality and nature that the defendant "should reasonably anticipate being haled into court" in the forum state.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). The minimum contacts standard, expressed in *Internat. Shoe Co. v. Washington, supra*, supplies "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where the conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson, supra* at 297.

A defendant's purposeful act, directed to the forum state, not merely the unilateral activity of another who claims a relationship to the defendant, connects the defendant to the forum state. *Hanson v. Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958).

In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), the Court considered the due process minimum contacts issue in relation to a nonresident defendant's contractual obligations to Burger King, a Florida corporation with its principal place of business in Miami. Rudzewicz and his partner, MacShara, both Michigan residents, jointly applied to Burger King's district office in Michigan for a Burger King franchise. Negotiations for a franchise lasted 4 months, during which Rudzewicz and MacShara communicated directly with officials at Burger King's Miami headquarters. Burger King eventually granted a 20-year franchise to Rudzewicz and MacShara. MacShara, who was to manage the franchised operation, attended management classes in Miami, that is, attended "[m]andatory training seminars . . . at Burger King University in Miami . . . ." 471 U.S. at 465 n.2. Rudzewicz, who supplied the necessary capital for the franchised operation, never physically entered Florida.

After Rudzewicz and MacShara failed to maintain payments prescribed by the franchise agreement, Burger King terminated the franchise. Rudzewicz and MacShara, however, continued to operate as a Burger King franchisee. Burger King sued both partners individually in a U.S. district court in Florida. Rudzewicz claimed that the court in Florida did not have personal jurisdiction over him.

On the jurisdictional question, the Supreme Court concluded that Rudzewicz' contract and dealings with Burger

King supplied a constitutionally permissible basis for personal jurisdiction over Rudzewicz. Recognizing prior cases dealing with contractual obligations, the Court noted that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz, supra* at 473 (quoting *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 70 S. Ct. 927, 94 L. Ed. 1154 (1950)). Rejecting the contention that an individual's contract with a party within a forum state may, in and of itself, provide the necessary contacts for personal jurisdiction in the forum state, the Court listed four factors to determine whether a defendant's contract supplies the contacts necessary for personal jurisdiction in the forum state: "It is these factors—prior negotiations and future contemplated consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King Corp. v. Rudzewicz, supra* at 479.

Concluding that Rudzewicz "deliberately 'reach[ed] out beyond' Michigan," 471 U.S. at 479, to negotiate the franchise agreement with Burger King, a Florida corporation, the Court held that Rudzewicz' establishment of a substantial and continuing relationship with Burger King's Miami headquarters supplied a sufficient basis for a court's constitutional exercise of personal jurisdiction over Rudzewicz in Florida.

According to the *Burger King* analysis, whether a Nebraska court has personal jurisdiction over a nonresident defendant depends on whether the defendant's contacts with Nebraska are the result of unilateral acts performed by someone other than the defendant, or whether the defendant himself acted in a manner which creates substantial connections with Nebraska, resulting in the defendant's "purposeful availment" of the benefits and protections of Nebraska law. *Burger King Corp. v. Rudzewicz, supra; McGowan Grain v. Sanburg,* 225 Neb. 129, 403 N.W.2d 340 (1987). After the extent and nature of the nonresident defendant's contacts are analyzed, the court may apply other facts bearing on reasonableness and fairness in

requiring the nonresident to defend a suit in Nebraska, such as the defendant's burden in the Nebraska litigation, Nebraska's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and efficient relief, the judicial system's interest in the efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).

Lerner's lack of physical presence in Nebraska is not controlling on the question whether Lerner has sufficient contacts with Nebraska to subject him to suit in Nebraska.

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King Corp. v. Rudzewicz, supra* at 476.

Despite lack of physical presence in the state where a contract is to be performed, a nonresident defendant, who purposefully directs activities toward a forum state's residents, through such contract, may be constitutionally subjected to suit in the state where the contract is to be performed. See, *Biltmoor Moving & Storage Co. v. Shell Oil Co.*, 606 F.2d 202 (7th Cir. 1979) (Illinois long-arm statute; personal jurisdiction in Illinois over a Texas moving consultant, which contracted to relocation of an Illinois corporation, when the consulting services were provided mostly by mail and telephone calls to Illinois); *Waterval v. District Court, etc.*, 620 P.2d 5 (Colo. 1980) (Colorado long-arm statute; personal jurisdiction over a Virginia defendant who, without physical presence in

Colorado, offered investment advice to a Colorado resident, who sustained damage by reliance on the advice given); *Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 389 N.E.2d 76 (1979) (Massachusetts court had personal jurisdiction over a Texas petroleum engineering firm, which agreed to provide and did provide a Massachusetts corporation with an appraisal of natural gas reserves in Texas); *Shepler v. Korkut*, 33 Mich. App. 411, 190 N.W.2d 281 (1971) (Michigan court had personal jurisdiction over Louisiana boat designer which sent its faulty design into Michigan, where the plaintiff constructed a defective boat on the basis of the faulty design); *Computac, Inc. v. Dixie News Co.*, 124 N.H. 350, 469 A.2d 1345 (1983) (New Hampshire court had personal jurisdiction over North Carolina news agency which contracted with New Hampshire firm for data processing services and sent raw data to New Hampshire over the telephone for processing); *Furda v. Superior Court (Serological Biopsy)*, 161 Cal. App. 3d 418, 207 Cal. Rptr. 646 (1984) (California court had personal jurisdiction over a Michigan resident who developed and marketed a secret biochemical biopsy process by providing services to California physicians). See, also, *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957) (California court had personal jurisdiction over Texas insurance company which provided insurance to California resident, although the company had no office or agent in California).

Courts considering whether personal jurisdiction exists over nonresident physicians have recognized that the unilateral activities of a patient cannot supply the minimum contacts essential for due process. See, *Wright v. Yackley*, 459 F.2d 287 (9th Cir. 1972) (Idaho court did not have jurisdiction over a South Dakota physician who prescribed medication for a South Dakota resident, who later moved to Idaho, although the physician forwarded the prescription to Idaho); *Etra v. Matta*, 61 N.Y.2d 455, 463 N.E.2d 3, 474 N.Y.S.2d 687 (1984) (New York court did not have personal jurisdiction over a Massachusetts physician who treated a New York patient in Massachusetts, when the Massachusetts physician did not solicit New York patients); *State ex rel. Sperandio v. Clymer*,

581 S.W.2d 377 (Mo. 1979) (Missouri court did not have jurisdiction over a Utah physician on account of consultative advice given from Utah regarding a Missouri patient's condition, where a Missouri physician solicited the medical advice and the Utah physician received no fee). The common thread of the foregoing decisions is the unilateral activity of the plaintiff, not the purposeful activity of the defendant, which connected the nonresident defendant with the forum state. See *Hanson v. Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958).

However, when a health care provider, such as a physician or hospital, purposefully directs activities toward a resident of the forum state, the provider is subject to the personal jurisdiction of courts in the state where the health care recipient resides. See, *Cubbage v. Merchent*, 744 F.2d 665 (9th Cir. 1984) (action in California where the court had personal jurisdiction over an Arizona hospital and Arizona physicians who actively solicited California patients); *Phelps v. Kingston*, 130 N.H. 166, 536 A.2d 740 (1987) (New Hampshire court had personal jurisdiction over Maine dentist who treated a New Hampshire patient in Maine, where the dentist solicited New Hampshire patients); *S. R. v. City of Fairmont*, 167 W. Va. 880, 280 S.E.2d 712 (1981) (West Virginia court had personal jurisdiction over Pennsylvania medical corporation that solicited West Virginia patients). Common to each of the foregoing cases is a defendant's purposeful act, namely, soliciting patients from the forum state, which subjected the defendant to suit in the forum state, that is, provided the defendant with foreseeability of being haled into court in the forum state. See *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

Appellants' claims against Lerner relate to Lerner's contractual relationship with Gould, which obligated Lerner to assist in the formulation of Gould policy relative to "industrial hygiene and safety aspects" of Gould's overall health program for lead contamination, as well as "[a]ssist company physicians in the medical management and evaluation of employees" suffering from lead absorption or other toxic conditions attributable to employment at Gould's Omaha smelter. Lerner

also described his role as including indoctrination of "workers regarding health effects of lead." In return for performance of these obligations, Lerner initially received in excess of $12,000 per year. The undisputed evidence reveals that Lerner actually carried out certain contractual obligations to Gould, including his consulting with Fitzgibbons "from time to time" on specific health problems of employees in Gould's Omaha plant. The Lerner-Gould contract provided the impetus for Lerner's professional information imparted to a Nebraska physician, who used the information in his care and treatment of Gould's Nebraska employees and their medical attention necessitated by employment at Gould's Omaha smelter plant. Thus, through the medium of a contract with a multistate corporation, Lerner voluntarily thrust his medical expertise into states known to be sites for Gould's operations.

Lerner claims that his involvement with the medical health of Gould's Omaha workers was not the result of "solicitation" by Lerner. We disagree. Although Lerner did not negotiate his contract with Gould in Nebraska, in their contract Lerner and Gould contemplated Lerner's conduct which culminated in Lerner's contact with Nebraska, contacts which had a substantial impact on Nebraska residents. While there is no evidence that Lerner solicited the business of individual Gould employees or actively advertised his services in Nebraska, the evidence is unambiguous regarding the existence and content of Lerner's contract with Gould. Lerner held himself out as an expert on occupational medicine and, through the contract, invited Gould and its "company" physicians to take advantage of his expertise. In such a situation, any demarcation between Lerner's invitation to Gould and direct solicitation of Gould employees becomes indiscernible and legally nonexistent. Lerner's ties with Nebraska are not the result of unilateral acts by appellants or some third party, but, rather, are the direct result of Lerner's activities and conduct attributable to a contractual relationship immediately affecting the health of Nebraska residents.

When Lerner entered the contract with Gould and carried out his contractual duties, Lerner "purposefully directed" his activities toward the State of Nebraska, and "purposefully

avail[ed]" himself of the privilege of conducting activities within Nebraska by accepting a contract under which he was paid for services rendered to Gould and Gould employees in Nebraska. See *Burger King Corp. v. Rudzewicz, supra.*

Further, Lerner has not shown any "other considerations," discussed in *Burger King Corp. v. Rudzewicz, supra*, which weigh against a Nebraska court's exercise of personal jurisdiction over Lerner. Nebraska has an interest in providing a forum for Nebraska employees injured by out-of-state actors who have purposefully directed their activities toward the state. In addition, the appellants' interest in obtaining convenient and effective relief, as well as the interstate judicial system's interest in the efficient resolution of disputes, is better served by a resolution of issues in Nebraska rather than multiple resolutions pertaining to several individual defendants in different forums. We also note that Lerner made no showing that he, as a defendant in a Nebraska court, is burdened more than he might be as a defendant in an Ohio court. See *Burger King Corp. v. Rudzewicz, supra.*

Therefore, we hold that Lerner has sufficient contacts with the State of Nebraska to constitutionally warrant a Nebraska court's assertion or exercise of personal jurisdiction over him.

### A SPECIAL APPEARANCE AND DISCOVERY

When a defendant has appeared specially and objected to personal jurisdiction over the defendant, to say that the factual basis for resolution of the jurisdictional question is important amounts to a major understatement. Affidavits, although permissible in connection with a special appearance, may be self-serving or otherwise provide information which is somewhat skewed by the party offering the affidavit in conjunction with a special appearance.

Therefore, any party to an action in which a special appearance has been filed is entitled to discovery authorized by the Nebraska Discovery Rules to ascertain facts relevant to the court's jurisdiction over the person of a defendant. Accord, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978); *Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987); *Surpitski v. Hughes-Keenan Corporation*, 362

F.2d 254 (1st Cir. 1966); *Nehemiah v. Athletics Congress of U.S.A.*, 765 F.2d 42 (3d Cir. 1985); *Amer. Lung Ass'n v. Farmers & Mer. Nat. Bank*, 329 S.E.2d 854 (W. Va. 1985); *Bielefeldt v. St. Louis Fire Door Co.*, 90 Wis. 2d 245, 279 N.W.2d 464 (1979). See, also, *Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982) (sanctions may be applied against a party who fails to comply with discovery in connection with an issue of personal jurisdiction). See, further, *English v. 21st Phoenix Corp.*, 590 F.2d 723 (8th Cir. 1979).

In the present case, however, appellants orally requested a continuance to obtain depositions pertaining to the issue of personal jurisdiction over Lerner. An application for continuance must be in writing and supported by an affidavit which contains factual allegations demonstrating good cause or sufficient reason necessitating postponement of proceedings. See Neb. Rev. Stat. § 25-1148 (Reissue 1985). See, also, *State v. Carter*, 226 Neb. 636, 413 N.W.2d 901 (1987); *Korte v. Betzer*, 193 Neb. 15, 225 N.W.2d 30 (1975); *Stastny v. Tachovsky*, 178 Neb. 109, 132 N.W.2d 317 (1964). Because appellants' request for a continuance was oral and, therefore, failed to comply with § 25-1148, which prescribes a written application for a continuance and supporting affidavit, we are precluded from considering whether the district court committed reversible error in denying a continuance, although appellants' requested continuance related to permissible discovery concerning the jurisdictional issue raised by Lerner's special appearance.

## CONCLUSION

The district court erred in sustaining Lerner's special appearance and dismissing appellants' actions. Therefore, the judgment of the district court is reversed, and these matters are remanded to the district court for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.