BARBARA L. POPPE, PERSONAL REPRESENTATIVE OF
THE ESTATE OF HEATHER A. POPPE, DECEASED,
APPELLANT, V. ROBIN F. SIEFKER, APPELLEE.

735 N.W.2d 784

Filed July 27, 2007.    No. S-05-670.

Robert R. Moodie, of Friedman Law Offices, for appellant.

Cathy S. Trent-Vilim, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

Heather A. Poppe was killed in an automobile accident when her car was struck by a car driven by Robin F. Siefker. Barbara L. Poppe, as personal representative of Heather's estate, filed a wrongful death lawsuit against Siefker. The only issue tried to the jury was the extent of the damages. The jury returned a verdict in favor of the estate for a total sum of $46,925.60. Following the trial, the court staff found in the jury deliberation room a "Personal Financial Slide-Calculator" and an inflation rate written on a "Post-it" note. The estate filed a motion for a new trial, asserting jury misconduct and inadequacy of the damage award. The district court denied the motion. The estate now appeals from the judgment and order of the district court denying the motion for new trial.

## BACKGROUND

Heather A. Poppe (Heather) was killed in an automobile accident on November 28, 2002. Heather had been driving west on Interstate 80 when her vehicle was struck head on by a car driven by Siefker while he was driving east in the westbound lane. Barbara L. Poppe (Barbara), Heather's mother, brought a wrongful death lawsuit on behalf of the estate against Siefker. At trial, Siefker admitted the accident was caused by his negligence. The only issue tried to the jury was the extent of the damages.

Heather was adopted by Arthur Poppe (Arthur) and Barbara in 1983, less than 3 days after she was born. Heather was raised in Kearney, Nebraska, in the same residence where Arthur and Barbara currently live. Heather graduated from high school in 2001 and moved from Kearney to Milford, Nebraska, where she began attending classes in automobile body repair at the Milford campus of Southeast Community College. Along with going to school full time, Heather worked Monday through Friday at a fast-food restaurant in Lincoln, Nebraska, and worked at another fast-food restaurant in Kearney on the weekends. Even though Heather was attending school on scholarship, Barbara testified that they had to take out additional school loans to cover some of her expenses. On occasion, Heather's parents would also help her pay other bills.

Although Heather was attending school in Milford, she stayed in frequent contact with her family in Kearney. Barbara testified that she talked to Heather on the telephone, usually every day, and would occasionally drive to Milford to see Heather. Barbara also testified that Heather would come home to Kearney every weekend. It is undisputed that Heather had a loving and caring relationship with her parents.

The record, however, also reflects that Heather had a boyfriend in Kearney whom she had been dating for a number of years. Heather's boyfriend had a daughter from another relationship who, at the time of trial, had just turned 6 years old. Barbara testified that at the same time that Heather was maintaining a relationship with her boyfriend, she was building a relationship with her boyfriend's daughter. Heather would spend

time with her boyfriend and his daughter on the weekends when she was not working.

The evidence further reveals that as Heather became older, she decided she wanted to reconnect with her biological parents. Heather's biological father lives in Fremont, Nebraska, with his current wife, and Heather's biological mother lived in Omaha, Nebraska, but later moved to Alabama. Heather would talk on the telephone with her biological father and would spend time with him as often as their schedules would allow. Heather also began corresponding with her biological mother. While her biological mother was living in Omaha, Heather would frequently visit her on weekends. After her biological mother moved to Alabama, Heather would travel there to visit.

Evidence was also presented at trial relating to the health conditions of Heather's parents. Barbara testified that she recently suffered from a "medical emergency related to a blood clot" that blocked the flow of blood to her liver. As a result of this condition, she spent 2 weeks in the hospital and remains on blood thinners. At the time of trial, the blood clot had not been dissolved. Barbara testified that doctors are "very cautiously making sure that everything is smooth where that is concerned, because if it compromises again, it could cost [her her] life."

In July 1999, Arthur suffered a heart attack that left him with "less than half a functioning heart" and "has had repeated close calls since." As a result of the heart attack, Arthur has had seven stents inserted in his body to help restore the blood flow. Arthur testified that on bad days, he suffers from shortness of breath and chest pain. Arthur has been told by doctors that his heart condition is not going to improve.

At the close of all the evidence, the estate moved for a directed verdict on its claim for funeral and burial expenses. The motion was granted, and the district court directed a verdict in the estate's favor for $6,925.60 on this claim. The court then proceeded to instruct the jury on the estate's claim for damages on behalf of Heather's parents for loss of consortium, services, society, companionship, and counsel resulting from the death of their daughter. With regard to calculating the

present value of any damages, the jury was given instruction No. 8 which stated:

> If you decide the Estate of Heather A. Poppe is entitled to recover damages for any future losses, then you must reduce those damages to their present cash value. You must decide how much money must be given to the estate today to compensate it fairly for future losses.

The case was then submitted to the jury which returned a verdict in favor of the estate for $40,000 regarding the claim on behalf of Heather's parents. Accordingly, judgment was entered by the court in favor of the estate for the total sum of $46,925.60.

Following receipt of the verdict and discharge of the jury, the court staff was cleaning the jury deliberation room and found an item labeled "Personal Financial Slide-Calculator." Attached to the personal financial slide calculator was a "Post-it" note which contained a handwritten inflation rate of 3.5 percent, averaged over 23 years. The court contacted counsel for both parties, marked these items collectively as exhibit 4, and, on its own motion, received them into evidence.

The personal financial slide calculator is divided into three separate sections, each of which performs different calculations. The user adjusts the figures in the calculation by moving an insert. The first section is entitled "One-time investment" and allows the user to calculate the amount of income that will be reinvested monthly on an initial investment based on the number of years invested and the rate of return. This section contains figures for initial investments of $1,000, $10,000, $25,000, and $50,000 over a period ranging from 5 to 25 years, and invested at hypothetical return rates of 6, 8, 10, and 12 percent. The second section is entitled "Initial investment with additional monthly investments." This section performs the same calculations as the first section, using the same initial investment figures and rates of return, except this section calculates the total return based on the assumption that the user is making additional monthly investments of either $100 or $250. The third section is entitled "Retirement income investment." This section allows the user to determine the number of years

a total investment will last based on a range of monthly withdrawals and various rates of return.

The estate filed a motion for new trial, asserting jury misconduct and inadequacy of the damage award. In support of its motion, the estate submitted affidavits of two of the jurors in this case. The district court denied the estate's motion. The court determined that the damages awarded were supported by the evidence and the presence of exhibit 4 in the jury room was not shown, by clear and convincing evidence, to have prejudiced the estate. The estate appealed.

## ASSIGNMENTS OF ERROR

The estate assigns that the district court erred in denying its motion for a new trial based on (1) jury misconduct and (2) inadequacy of the damage award.

## STANDARD OF REVIEW

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion.[1] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through the judicial system.[2]

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.[3]

## ANALYSIS

### JURY MISCONDUCT

The estate argues that the personal financial slide calculator and the inflation rate on the "Post-it" note constitute

---

[1] *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006).

[2] *Hamit v. Hamit*, 271 Neb. 659, 715 N.W.2d 512 (2006).

[3] *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006).

extraneous prejudicial information pursuant to Neb. Rev. Stat. § 27-606(2) (Reissue 1995). The estate contends that given the presence of these items in the jury deliberation room, the district court abused its discretion in denying the estate's motion for new trial.

Section 27-606(2) prohibits a juror from testifying as to information relating to the process of jury deliberations, except that evidence may be adduced "on the question whether extraneous prejudicial information was improperly brought to the jury's attention." The affidavits offered by the estate were relevant to the issue of whether extraneous prejudicial information was improperly brought to the jury's attention. The issue before this court, then, is whether, in light of the evidence presented, the estate has met its burden of proving that prejudice has occurred. We conclude that the estate has not met this burden and therefore affirm the judgment of the district court.

An application for new trial may properly be based upon allegations of misconduct of the jury.[4] In a motion for new trial, allegations of misconduct by jurors must be substantiated by competent evidence.[5] The misconduct complained of must relate to a disputed matter that is relevant to the issues in the case and must have influenced the jurors in arriving at the verdict.[6]

In order for a new trial to be ordered because of juror misconduct, the party claiming the misconduct has the burden to show by clear and convincing evidence that prejudice has occurred.[7] Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.[8] Extraneous material or information considered by a jury may

---

[4] See, Neb. Rev. Stat. § 25-1142 (Cum. Supp. 2006); *Leavitt v. Magid*, 257 Neb. 440, 598 N.W.2d 722 (1999).

[5] *Smith v. Papio-Missouri River NRD*, 254 Neb. 405, 576 N.W.2d 797 (1998); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

[6] *Smith, supra* note 5.

[7] *Hunt v. Methodist Hosp.*, 240 Neb. 838, 485 N.W.2d 737 (1992).

[8] *Dillon Tire, Inc. v. Fifer*, 256 Neb. 147, 589 N.W.2d 137 (1999).

be deemed prejudicial without proof of actual prejudice if the material or information relates to an issue submitted to the jury and there is a reasonable possibility that the extraneous material or information affected the verdict to the detriment of a litigant.[9] The trial court's ruling on a question involving jury misconduct will not be disturbed on appeal absent an abuse of discretion.[10]

In support of its motion for new trial, the estate offered the affidavits of jurors L.O. and S.W. Juror L.O. averred that exhibit 4 belonged to him and was in his sports coat pocket when the jury began deliberations. Juror L.O. further averred that the "Post-it" note with the inflation rate was also his and was attached to the personal financial slide calculator when it came out of his coat in the jury room. Juror L.O. explained that he "looked at Exhibit No. 4 during the deliberations but did not pass it around to other jurors." Juror S.W. stated in her affidavit that "she did not look at Exhibit No. 4 during the jury deliberations" but she did observe "other jurors looking at Exhibit No. 4 during the course of deliberations."

The estate contends that in light of these affidavits, there is a reasonable possibility that exhibit 4 affected the verdict to its detriment. The court denied the estate's motion for a new trial, concluding that the estate had failed to show by clear and convincing evidence that it was prejudiced by the presence of exhibit 4. We agree. While we do not condone the presence of these nonevidentiary items in the jury deliberation room without the knowledge of the court, we nonetheless cannot say, under these circumstances, that the presence of exhibit 4 in the deliberation room rises to the level of prejudice which warrants setting aside the jury's verdict.

The personal financial slide calculator, in this instance, was nothing more than a device which allowed the user to perform mathematic calculations quickly and easily.[11] It was not itself

---

[9] *In re Petition of Omaha Pub. Power Dist.*, 268 Neb. 43, 680 N.W.2d 128 (2004).

[10] *Id.*

[11] See *State v. Lihosit*, 131 N.M. 426, 38 P.3d 194 (N.M. App. 2002).

evidence of a fact at issue, nor did it create evidence that the jury could have considered.[12] A juror referencing the slide calculator would have to decide each and every variable that went into the calculation of the verdict, including the amount of money, rate of interest, and period of time.[13] In reality, all the slide calculator did was perform a mathematical calculation that could have been done with a pencil and paper, except that the slide calculator potentially made the calculation easier and the result more accurate.[14]

In evaluating prejudice, we also note that neither party presented any evidence to the jury with regard to the process by which the jury was to calculate the present value of any damages. In this regard, the only guidance the jury received was given by the court in jury instruction No. 8, which instructed the jury to reduce damages for future losses to their present cash value, but did not explain how this was to be done.

Given that the jury was not provided any evidence on present value, nor instructed as to how present value was to be calculated, the personal financial slide calculator and the handwritten inflation rate could not have contradicted any of the evidence presented at trial. Nor could the jury have given undue weight to these items, while disregarding other evidence adduced at trial, because there simply was no evidence presented on this issue.

We also note that the affidavits are not clear as to how many of the jurors actually saw the personal financial slide calculator and inflation rate during deliberations. The estate offered the affidavits of two jurors. Only one of those jurors looked at exhibit 4. Although juror S.W. stated that "other jurors" looked at exhibit 4, it is unclear whether juror S.W.'s reference to "other jurors" indicated anyone other than juror L.O. Juror

---

[12] See, *Imperial Meat Company v. United States*, 316 F.2d 435 (10th Cir. 1963); *Lihosit, supra* note 11.

[13] See *Lihosit, supra* note 11.

[14] See, *Imperial Meat Company, supra* note 12; *Lihosit, supra* note 11. See, also, *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, 894 P.2d 881 (1995); *Bobbie Brooks, Inc. v. Goldstein*, 567 S.W.2d 902 (Tex. Civ. App. 1978).

L.O.'s affidavit plainly states that he "did not pass [exhibit 4] around to other jurors." The evidence is at best inconclusive as to how many other jurors, if any, viewed exhibit 4 during deliberations.

Furthermore, there is no evidence that exhibit 4 influenced the jury's decision in any way, much less that it influenced the decision in any particular way. While it is possible that the presence of exhibit 4 in the jury deliberation room resulted in a decreased award, it is equally possible that its presence resulted in an increase in the award. We have no basis, other than speculation, upon which to determine how a juror's calculation of present value would be affected by exhibit 4, if it was affected at all.

In short, the record does not contain clear and convincing evidence that prejudicial jury misconduct occurred. Given the circumstances of this case, we cannot say that the estate was prevented from receiving a fair trial. Accordingly, we conclude that the estate has not met its burden of proving prejudicial jury misconduct, and the trial court did not abuse its discretion in denying the estate's motion for a new trial on this basis.

## Adequacy of Verdict

The estate also contends that the damage award was inadequate. This court has consistently recognized that a plaintiff in an action for wrongful death of a child may recover damages for loss of the deceased's society, comfort, and companionship which are shown by the evidence to have a pecuniary value.[15] The term "society" embraces a broad range of mutual benefits each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, and protection.[16] Parental loss is not limited to or necessarily dependent upon deprivation of the child's monetary contribution toward parental well-being.[17] However, damages on account of mental suffering or

---

[15] See *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829 (2002).

[16] *Id.*

[17] *Id.*

bereavement or as solace to the next of kin on account of the death are not recoverable.[18]

An award of damages may be set aside as inadequate when, and not unless, it is so inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record.[19] If an award of damages shocks the conscience, it necessarily follows that the award was the result of passion, prejudice, mistake, or some other means not apparent in the record.[20]

With regard to the adequacy of a verdict, we have stated that "'[i]t is virtually impossible to "color match" cases' to determine whether a verdict in a particular case was adequate."[21] One common thread runs throughout all wrongful death cases, namely, that damages in any wrongful death case are incapable of precise computation and are largely a matter for the jury.[22]

In the present case, there is uncontroverted evidence of a close and loving relationship between Heather and her parents. The testimony presented at trial shows that Heather was a bright, considerate, dependable, and loving child who had a variety of interests both in and out of school. However, based on the facts and circumstances of this case, we cannot say that the jury verdict was so inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. The jury was instructed, without objection, to consider the following factors when arriving at a verdict:

> (1) Any financial support, services, comfort or companionship that Heather Poppe gave to her parents before her death and the prospect that there would have been changes in the future;
>
> (2) the physical and mental health of Heather Poppe had she lived;

---

[18] See *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989).

[19] *Brandon, supra* note 15.

[20] *Id.*

[21] *Reiser v. Coburn*, 255 Neb. 655, 660, 587 N.W.2d 336, 340 (1998).

[22] See *id.*

(3) Heather Poppe's life expectancy immediately before her death; and

(4) the life expectancy of Heather Poppe's parents.

At the time of her death, Heather was 19 years old and had moved away from her parents in Kearney to attend school in Milford. Although Heather kept in contact with her family and came home to Kearney every weekend, the evidence reveals that Heather's time with her parents was limited and was becoming increasingly so as a result of the many activities in her life. The jury was also entitled to consider, in its determination of damages, the life expectancy of Heather's parents. A significant amount of testimony was presented at trial indicating that Arthur and Barbara each had a history of health problems that could affect their life expectancies.

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.[23] Given our standard of review and the record with which we are presented, we conclude that the evidence presented at trial was adequate to support the award of $46,925.60, and therefore, the district court did not abuse its discretion in overruling the estate's motion for new trial.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

HEAVICAN, C.J., not participating.

---

[23] *Shipler, supra* note 3.