IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


ALMOND V. REEVES


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


HARRY DOUGLAS ALMOND AND JEANINE ELIZABETH ALMOND, APPELLANTS,

V.

JANET D. REEVES, APPELLEE.


Filed July 19, 2016.    No. A-15-659.


Appeal from the District Court for Sarpy County: MAX KELCH, Judge. Affirmed.

James R. Welsh and Christopher Welsh, of Welsh & Welsh, P.C., L.L.O., for appellants.

Karen K. (Weinhold) Bailey, of Engles, Ketcham, Olson & Keith, P.C., for appellee.


INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Harry Douglas Almond and his wife, Jeanine Elizabeth Almond, appeal from a judgment entered following a jury trial on their claims against Janet D. Reeves and her son, Kevin E. Reeves. The claims arose out of a collision between a truck driven by Harry and a car owned by Janet but operated by Kevin. Following trial, a jury returned a verdict in Harry's favor on his negligence claim and awarded him damages of $307. The jury found in favor of the defense on Jeanine's loss-of-consortium claim. On appeal, the Almonds argue that the district court for Sarpy County erred in denying their motion to continue trial, that the jury's verdict of $307 was inadequate as a matter of law, and that the court erred in denying their motion for new trial. We affirm.

## FACTUAL BACKGROUND

On the morning of January 10, 2009, Harry was driving his 1994 Ford F-150 pickup truck northbound on 36th Street in Bellevue, Nebraska. As Harry drove through the intersection of 36th Street and Leawood Drive, a 2001 Chevrolet Cavalier driven by Kevin collided with Harry's truck,

- 1 -

forcing it into a culvert on the east side of 36th Street. The truck continued moving, exiting the culvert and coming to rest on the west side of 36th Street.

After first responders arrived, Harry reported feeling fine and declined medical treatment. However, three or four days following the accident, Harry began experiencing pain in his neck. On January 13, 2009, he saw his family physician, Dr. Joseph Dumba, complaining of neck pain. He saw Dr. Dumba again on February 6, still complaining of pain. The doctor ordered an X-ray, which showed "[m]oderately severe degenerative change" in the cervical spine. At a visit with Dr. Dumba on May 5, Harry again complained of neck pain. Harry's medical records contained no other references to his neck pain in 2009, 2010, or 2011.

The next time a complaint of neck pain appeared in Harry's medical records was July 27, 2012, when he saw Dr. Derrick E. Anderson, a family physician who began treating Harry for diabetes and other medical issues in September 2010. At the July 27, 2012, visit, Harry complained of intermittent neck pain that occasionally woke him up at night. The doctor referred Harry to a chiropractor for evaluation and treatment. Harry saw the chiropractor from August 2012 through August 2013.

On May 21, 2014, Harry underwent an MRI of the cervical spine. Around the same time, Dr. Anderson referred Harry to Dr. Arun-Angelo Patil, an orthopedic surgeon, for evaluation. Dr. Patil's notes from an office visit on June 17, indicated that the "MRI was reviewed and did not show any significant stenosis." At a subsequent visit with Dr. Patil on October 9, Harry continued to complain of neck pain and upon examination was found to have "limitation of left lateral tilt." Dr. Patil ordered Harry to undergo physical therapy for 3 weeks, which Harry completed. Afterwards, Harry continued doing the exercises for his neck that he learned during physical therapy.

At trial in May 2015, Harry's medical records detailing the history of his neck pain were received into evidence without objection, as was a summary of his medical bills. The summary of Harry's medical bills showed the following:

| Provider | Dates of Treatment | Cost |
|----------|--------------------|------|
| Dr. Dumba | 1/13/09 to 2/6/09 | $307 |
| Dr. Anderson | 7/27/12 to 4/29/15 | $843 |
| Chiropractor | 8/17/12 to 8/23/13 | $599 |
| Dr. Patil | 6/17/14 to 1/29/15 | $257 |

The medical bills totaled $2,006.

The three witnesses at trial were Harry, Jeanine, and Dr. Anderson. Harry, who was 69 years old, testified that he continued to suffer from neck pain. According to Harry, he had no problems with his neck prior to the accident. Following the accident, he had pain in his neck and would hear "sort of a grinding noise" when he turned his head. His neck also "lock[ed] up" sometimes, making it difficult to turn his head. Approximately one or two months prior to trial, he also began experiencing numbness from his neck "down [to his] chest." At the time of trial, his neck pain was "more tense" than it was in the days following the accident. Harry was no longer able to shovel snow off of the sidewalk or work on his vintage car. In addition, he woke up between

two and six times per night due to pain and discomfort. Consequently, he had to sleep in a different room than his wife.

Harry testified that for the prior 16 years he had operated his own business performing "cryogenics," which involved freezing metal items to extremely cold temperatures in order to harden them and "break them in." For example, he treated knives, gun barrels, and musical instruments. On cross-examination, Harry testified that the items he treated included car engines and industrial equipment. He explained that he used a hoist to assist with lifting heavy items. Harry admitted that he continued working full-time following the accident and at the time of trial. He had not sustained any loss of income from the accident.

Jeanine's testimony confirmed Harry's sleeping difficulties, as well as his inability to perform certain household tasks. Jeanine testified that Harry did not complain of neck pain "all the time," but did so when he moved a certain way or when lying down. Jeanine also confirmed that Harry had recently begun complaining of numbness and tingling down his chest.

Dr. Anderson was the only physician to testify. He testified that he primarily treated Harry for diabetes, high blood pressure, cholesterol, and irregular heartbeat. However, Harry also "consistently complained of left-sided neck pain that sometimes awoke him at nighttime." According to Dr. Anderson, he and Harry discussed the neck pain during "almost each and every" visit, even though Dr. Anderson did not document all of these discussions in Harry's medical records.

When Dr. Anderson was asked if he had an opinion within a reasonable degree of medical certainty as to the cause of Harry's neck problems, he testified that he believed they resulted from the January 2009 car accident. He explained that there was no indication of any other trauma or injuries consistent with Harry's complaints. Dr. Anderson believed Harry would require life-long "conservative management" of his neck pain, including medication, physical therapy, stretches, and/or exercises.

On cross-examination, Dr. Anderson testified that he first documented Harry's complaints of neck pain during the office visit on July 27, 2012, because it was at that visit that Harry reported a worsening of his neck pain and requested a referral to a chiropractor. Dr. Anderson explained that July 27 was not the first time he discussed the neck pain with Harry; the doctor simply did not document the prior discussions in his notes.

Dr. Anderson also testified on cross-examination that Harry's MRI completed on May 21, 2014, showed "degenerative changes" and "a little bit of . . . stenosis, which is narrowing of some of the places that the nerves actually go through in your neck." However, the stenosis was not "very severe or serious." Dr. Anderson explained that degenerative changes in the neck could be exacerbated by a traumatic event, but he admitted it was possible for degenerative changes to cause pain without a traumatic event. He also agreed that his opinion that the January 2009 accident caused Harry's neck pain was based on Harry's self-reporting of the accident and symptoms. Dr. Anderson testified that Harry had been diagnosed with sleep apnea, although Harry had not received any treatment for that condition.

PROCEDURAL BACKGROUND

On January 7, 2013, Harry and Jeanine filed suit against Kevin and Janet. Early in the case, Kevin was dismissed from the suit upon the parties' stipulation, and the action proceeded against Janet only. Count I of the complaint sounded in negligence and sought recovery for Harry's injuries allegedly resulting from the accident. Count II was Jeanine's loss-of-consortium claim.

A jury trial was originally scheduled for March 18, 2014. However, the Almonds filed a total of five motions to continue trial, and the trial was continued three times. Because the district court's denial of the Almonds' final motion to continue is at issue on appeal, we summarize the history of continuances.

The Almonds' first motion to continue is not contained in the record; however, on March 4, 2014, the court granted the Almonds' motion to continue, rescheduling trial to July 8. The record does not disclose the reason for the continuance.

On June 11, 2014, the Almonds filed their second motion to continue. The motion alleged that Harry had "recently been informed that he will need to have surgery due to the injuries he sustained in the accident, which is the subject of this lawsuit." On June 16, the court granted the motion and rescheduled trial to October 28. (The record is clear that Harry never had surgery.)

The record does not contain the Almonds' third motion to continue. However, at a hearing on September 29, 2014, the court addressed the third motion. During the hearing, the Almonds' counsel indicated that Harry had an appointment scheduled with Dr. Patil on October 9 and suggested that the doctor may recommend surgery. The court noted that this was the Almonds' third motion to continue and that counsel had not presented "anything too definitive" in support of the motion, other than indicating that Harry "just simply made an appointment with another doctor . . . and wanted to be checked out again." The court concluded that a third continuance was not warranted.

On October 20, 2014, the Almonds filed their fourth motion to continue. The motion alleged that Harry "is still under the care of a doctor for the condition which is the subject in this lawsuit." The motion was supported by an affidavit from Dr. Anderson, who attested that he referred Harry to Dr. Patil, who subsequently referred Harry to physical therapy. According to Dr. Anderson, Harry had three weeks of physical therapy remaining. Dr. Anderson opined that, if the physical therapy did not "significantly reduce" Harry's pain, "Dr. Patil will have no alternative but to perform cervical surgery."

On October 27, 2014, at a hearing on the fourth motion to continue, the Almonds' counsel indicated that he had spoken with Dr. Anderson that morning. During the phone conversation, Dr. Anderson advised that Dr. Patil would not make a decision on whether Harry needed surgery until after Harry completed physical therapy two weeks later. Based on this representation, the court granted the motion, rescheduling trial to May 12, 2015. At the conclusion of the hearing, after granting the continuance, the court addressed the Almonds' counsel, stating, "I want you to understand this will not happen again."

Although they did not concern motions to continue trial, two hearings on motions in limine filed by Janet are relevant to the continuance issue. Janet filed her first motion in limine on February 10, 2015. She sought to exclude, among other things, any testimony from non-disclosed

experts, including Dr. Patil. Specifically, Janet alleged that there had "been no disclosure for the need for any surgery, which was the reason the trial was allegedly continued the last time." At a hearing on the motion in limine on April 27, the Almonds' counsel indicated he had no objection to this request, as the only physician he intended to call as a witness was Dr. Anderson. Counsel stated that Dr. Patil had not advised that Harry needed surgery.

Janet filed her second motion in limine on May 5, 2015. The motion alleged that Harry had undergone an Independent Medical Examination (IME) at the defense's request. Following the IME, the Almonds' counsel informed defense counsel that Harry was complaining of increased pain, allegedly resulting from the IME. Janet sought to exclude any reference to the IME.

At a hearing on Janet's second motion in limine on May 7, 2015, the Almonds' counsel argued that under principles of causation in negligence actions, Janet could be liable for any aggravation of Harry's neck injury resulting from the IME. The Almonds' counsel further argued that the aggravation of Harry's injury may have "put him over the hill as far as needing surgery." However, counsel noted that he would not be able to get a doctor's opinion on Harry's need for surgery before trial, which remained scheduled for Tuesday, May 12. In response, the court stated, "I want to assure you, we will go to trial on Tuesday." Counsel responded, "That's fine." The court then ruled that Harry would be allowed to testify at trial that he had "an examination" and that, as a result, he believed his preexisting neck injury from the car accident had been aggravated. However, the court ruled that Harry could not reference the IME specifically or the fact that it was completed at the defense's request.

Despite the court's warning at the May 7, 2015, hearing that trial would not be continued, the Almonds filed a fifth motion to continue trial on May 12, the day of trial. On the morning of May 12, the jury selection process was completed, and a 12-member jury was sworn in. The court then took a recess to address preliminary matters outside of the jury's presence. During this recess, the court took up the Almonds' fifth motion to continue. The motion alleged that because Harry's neck injury had been aggravated during the course of the IME in April, a continuance was necessary for Harry "to undergo an additional medical examination for the purpose of determining whether the enhanced injury requires surgery." In support of the motion to continue, the Almonds' counsel offered Dr. Anderson's notes from an office visit with Harry on April 29. In the notes, Dr. Anderson indicated that, since undergoing the IME, Harry had reported feeling "shooting pain that radiates from the neck to the chest to the arm."

The court declined to consider the doctor's notes for purposes of the motion, reasoning that they were not in the form of an affidavit as required by Neb. Rev. Stat. § 25-1148 (Reissue 2008). The court further noted that even if it considered the doctor's notes, they simply recited Harry's self-reported pain. The court concluded that there was "no medical basis to continue this trial," and denied the motion. The court repeated that, pursuant to its prior ruling on Janet's motion in limine, Harry could testify that he had "an examination" and that he believed his neck injury had been aggravated during the examination.

After the court denied the Almonds' fifth motion to continue, the jury trial commenced. At the beginning of trial, the defense stipulated to liability for the collision. Therefore, the only contested issues at trial were causation and damages. At the conclusion of trial, the jury returned

a verdict in Harry's favor on count I and awarded damages of $307. On count II, Jeanine's loss-of-consortium claim, the jury returned a defense verdict.

The Almonds filed a motion for new trial, arguing that the verdict was inadequate and that the district court erred in denying their motion to continue trial. After the district court denied the motion for new trial, the Almonds timely appealed.

## ASSIGNMENTS OF ERROR

The Almonds assign as error that (1) the district court abused its discretion in refusing to grant a continuance of their trial date to enable Harry to obtain an opinion as to whether he needed surgery for an aggravation of his initial injury by a medical provider he saw at the defense's request, (2) the jury verdict was inadequate as a matter of law, and (3) the district court erred in overruling the Almonds' motion for a new trial.

## STANDARD OF REVIEW

A motion for continuance is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001).

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Poppe v. Siefker*, 274 Neb. 1, 735 N.W.2d 784 (2007).

A motion for new trial is addressed to the discretion of the trial court, and the trial court's decision will be upheld unless it is based upon reasons that are untenable or if its action is clearly against justice or conscience, reason, and evidence. *Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002).

## ANALYSIS

*Motion to Continue Trial.*

The Almonds' first assignment of error is that the district court abused its discretion in denying their final motion to continue trial. In support, they argue that their motion was "necessitated by an unforeseeable accident" during the IME, which "caused a serious aggravation" of Harry's neck injury. Brief for appellants at 6. They contend that the "incident occurred only three weeks before the scheduled trial date, leaving [Harry] insufficient time to obtain a medical opinion as to causation and medical treatment." *Id*. at 7. The Almonds argue that the district court denied their final motion for a continuance on the basis that Dr. Anderson "did not indicate that [Harry] needed surgery," and that this reasoning was "untenable," because Dr. Anderson was not qualified to determine whether a patient needed surgery on his or her spine. *Id*. The Almonds claim they were prejudiced by the court's ruling, because Janet may have been liable for any additional harm caused during the IME.

Janet responds that denial of the motion for continuance was proper because the Almonds failed to comply with § 25-1148 by not supporting their motion to continue with an affidavit. Janet further argues that, even overlooking the lack of an affidavit, the court's denial of the motion was reasonable, given the Almonds' prior requests for continuances and the fact that they sought their final continuance on the morning of trial.

Generally, under § 25-1148, an application for continuance must be in writing and supported by an affidavit which contains factual allegations demonstrating good cause or sufficient reason necessitating postponement of proceedings. *Williams v. Gould, Inc.*, 232 Neb. 862, 443 N.W.2d 577 (1989). However, the failure to comply with the provisions of § 25-1148 is but a factor to be considered in determining whether a trial court abused its discretion in denying a continuance. *Velehradsky v. Velehradsky*, 13 Neb. App. 27, 688 N.W.2d 626 (2004). In addition to a party's compliance with § 25-1148, we are to consider three analytical factors when reviewing a trial court's denial of a motion for continuance: (1) the number of continuances granted to the moving party, (2) the importance of the issue presented in the matter, and (3) whether the continuance was being sought for a frivolous reason or a dilatory motive. *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001); *Velehradsky v. Velehradsky, supra*.

Viewing the procedural history of this case in light of the applicable factors, we conclude the district court did not abuse its discretion in denying the Almonds' final motion to continue trial. First, the district court correctly took into consideration that the Almonds failed to support their motion with an affidavit as required by § 25-1148. The notes from Harry's office visit with Dr. Anderson on April 29, 2015, did not satisfy the statute's requirement of an affidavit from a person competent to testify "setting forth the facts upon which such continuance or adjournment is asked." § 25-1148. Nevertheless, the Almonds' compliance with § 25-1148 is only one factor for us to consider in reviewing the denial of the motion. See *Velehradsky v. Velehradsky, supra*.

The next factor--the number of continuances granted to the moving party--also supports the court's decision to deny the motion for continuance. We detailed above the history of the Almonds' requests for continuances, which involved five motions to continue trial resulting in three continuances. The record does not disclose the reason for the first motion resulting in the first continuance; however, all of the remaining motions were based on Harry's ongoing medical treatment and his potential need for surgery. For example, in their second motion for continuance, the Almonds alleged that Harry had "recently been informed that he will need to have surgery." However, the Almonds softened that statement in their next two requests for continuances, indicating to the court that an opinion on Harry's need for surgery was forthcoming. Yet, as counsel stated at the hearing on Janet's first motion in limine, an opinion that Harry needed surgery never materialized.

When the district court took up the Almonds' fifth motion for continuance on the morning of trial, it was aware of the history of their prior requests for continuances. Even fresher in the court's mind, however, was the exchange it had with the Almonds' counsel five days earlier at the hearing on Janet's second motion in limine. At that hearing, when the Almonds' counsel made comments suggesting that the aggravation of Harry's injury during the IME may require another continuance to obtain a doctor's opinion on Harry's need for surgery, the court stated, "I want to assure you, we will go to trial on Tuesday." Counsel responded, "That's fine." In light of this

exchange, it likely came as a surprise when five days later, on the morning of trial, the Almonds' counsel alleged that a continuance was necessary for Harry "to undergo an additional medical examination for the purpose of determining whether the enhanced injury requires surgery." Given the history of continuances and the discussion at the hearing on Janet's second motion in limine, the court acted reasonably in denying the motion.

The next factor--the importance of the issue presented in the matter--also supports the court's denial of the motion. Certainly, a physician's opinion that Harry needed neck surgery would have been a significant item of evidence at trial. However, the importance of granting Harry additional time to obtain such an opinion diminished with each subsequent request for a continuance on this basis. At some point, the case needed to go to trial, even if Harry had not obtained a physician's opinion that he needed surgery; Harry was not entitled to unlimited continuances for the purpose of obtaining a favorable expert opinion.

While the Almonds, in essence, argue that the aggravation of Harry's injury during the IME resulted in a new and different reason for continuing trial, there is no medical evidence to support this view. The court did not receive Dr. Anderson's notes into evidence and the Almonds have not appealed this ruling. Even if the exhibit had been admitted, the April 29, 2015, notes simply stated that since undergoing the IME, Harry had reported feeling "shooting pain that radiates from the neck to the chest to the arm." Nothing in Dr. Anderson's notes, nor any evidence in the record, indicated that Harry's new symptoms necessitated a referral to a surgeon. As the district court found, the Almonds established "no medical basis" to continue trial. While the approximately 3-week time period between the IME and the day of trial was short (the record does not disclose the exact date of the IME), in light of the history of continuances, it was imperative for the Almonds to support their final motion for continuance with facts demonstrating good cause or sufficient reason for further postponing trial. They failed to do so.

It is also worth noting that the district court was not unaware of the importance of the surgery issue for trial. The court granted three continuances, extending the trial date by more than a year, to accommodate Harry's effort to obtain a physician's opinion that he needed surgery. Even when Harry sought to continue trial a final time for the same reason, the court reached a fair compromise, denying the motion for continuance but allowing Harry to testify that he had a recent examination that aggravated his preexisting neck injury sustained during the accident.

The final factor--whether the continuance was being sought for a frivolous reason or a dilatory motive--does not tip the scales significantly one way or the other. To some extent, the history of the Almonds' requests for continuances suggests a dilatory motive. At times, the motive was almost explicit, as when the Almonds' counsel indicated at the hearing on the third motion for continuance that he needed more time because "[t]his case becomes considerable if, in fact, [Harry] needs surgery and there's that kind of bill." However, reading the record as a whole, we are not left with the impression that the Almonds sought the continuances in bad faith or for frivolous reasons.

Considering all of the applicable factors, we conclude the district court did not abuse its discretion in denying the Almonds' fifth and final motion to continue trial.

*Adequacy of Jury Verdict.*

The Almonds' second assignment of error is that the jury verdict of $307 was inadequate as a matter of law. The Almonds argue that the "total amount of medical bills submitted into evidence without objection was $2,006." Brief for appellants at 9. They maintain that the jury verdict not only failed to cover the total medical bills, but also included no damages for pain and suffering, "despite significant evidence that [Harry] suffered, and continues to suffer, debilitating neck pain which disrupts his daily activities and prevents him from sleeping at night." *Id*. The Almonds contend that the evidence of Harry's medical bills and pain and suffering was undisputed, as the defense presented no witnesses or evidence at trial.

Janet responds that the jury's verdict was based on the medical bills incurred prior to "a lengthy gap in treatment" and that the jury found that Harry's "subsequent treatment was unrelated to the accident." Brief for appellee at 21. Janet further notes that although the defense presented no evidence, defense counsel cross-examined all of the Almonds' witnesses.

An award of damages may be set aside as inadequate when, and not unless, it is so inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Poppe v. Siefker*, 274 Neb. 1, 735 N.W.2d 784 (2007). If an award of damages shocks the conscience, it necessarily follows that the award was the result of passion, prejudice, mistake, or some other means not apparent in the record. *Id*. Where the amount of damages allowed by a jury is clearly inadequate under the evidence, it is error for the trial court to refuse to set the verdict aside. *Christian v. Smith*, 276 Neb. 867, 759 N.W.2d 447 (2008).

The jury was instructed that if it returned a verdict in favor of either plaintiff, it was required to decide how much money would fairly compensate the plaintiff for his or her injury. In the context of Harry's negligence claim, the jury was instructed that it could consider: (1) the nature and extent of the injury, including whether the injury is temporary or permanent; (2) the reasonable value of medical care and supplies reasonably needed by and actually provided to Harry, and reasonably certain to be needed and provided in the future; and (3) the physical pain and mental suffering Harry has experienced and is reasonably certain to experience in the future. The instructions further directed the jury not to engage in speculation, guess, or conjecture or to award damages by way of punishment or through sympathy.

Relevant to the issue of damages, a summary of Harry's medical bills was received into evidence without objection. However, the admission of medical bills into evidence without objection does not mean the opposing party has conceded that these costs were necessitated by the accident. *Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002). Instead, the jury is entitled to determine what portion of a claimed injury was proximately caused by the incident and what portion of the medical bills was reasonably required. *Id*. Furthermore, the jury is not required to accept a party's evidence of damages at face value, even though that evidence is not contradicted by evidence adduced by the party against whom the judgment is to be entered. *Id*.

Two cases addressing the adequacy of jury verdicts are instructive. In *Jones v. Meyer*, 256 Neb. 947, 594 N.W.2d 610 (1999), the plaintiff was involved in a car accident and taken to a hospital for evaluation. She was discharged from the hospital the same night after tests returned normal results. She then began seeing a chiropractor, whom she saw approximately 100 times over

the next 2 years 7 months at a cost of $4,360. At trial, the defense admitted liability for the collision and stipulated to the fairness and reasonableness of the hospital bills incurred on the day of the accident. No stipulations were made regarding the chiropractor bills; however, the chiropractor testified that the bills were fair, reasonable, and necessitated by the injuries the plaintiff sustained in the car accident. The evidence disclosed that there had been three breaks in the plaintiff's treatment with the chiropractor, and during cross-examination, the plaintiff admitted that, at times, the chiropractor had treated her for pain incurred after performing various activities, such as moving out of her apartment. The jury awarded a verdict that exceeded the plaintiff's hospital bills incurred on the day of the accident, but that did not include all of the chiropractor's bills.

The Nebraska Supreme Court affirmed the jury's verdict, reasoning that there was no stipulation that the chiropractor's bills were fair, reasonable, or necessitated by the accident. *Id*. Furthermore, although the chiropractor testified that his bills were fair, reasonable, and necessary, the jury was not required to take the expert's opinion as binding upon it, because it was the province of the jury to determine what weight should be given expert testimony. *Id*. The Supreme Court reasoned that even though the defense did not present any evidence to dispute the medical bills or the chiropractor's testimony, the jury could have concluded that not all of the chiropractor's treatments were necessitated by the accident. *Id*. In reaching this conclusion, the jury could have relied upon the gaps in the plaintiff's treatment and on the plaintiff's testimony on cross-examination that, at times, she saw the chiropractor for pain incurred after performing activities such as moving out of her apartment.

In contrast to *Jones v. Meyer, supra*, *Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002), is an example of a case in which a jury's verdict was held to be inadequate. In *Springer*, the plaintiff cyclist was injured when she was struck by a car. The plaintiff was transported by ambulance to the hospital and underwent surgery for an ankle fracture. She required follow-up surgery to remove the pins from her ankle. Although the total medical bills exceeded $6,100, the jury returned a verdict in the plaintiff's favor of $2,908. The district court granted the plaintiff's motion for new trial on the basis that the verdict was inadequate. The Nebraska Supreme Court affirmed, reasoning that the evidence clearly established that a minimum of $4,805.82 of medical expenses, not including the follow-up care, were incurred during the emergency care and surgery immediately following the accident. *Id*. The court concluded that the jury had committed a gross error or had rendered a verdict so clearly wrong as to indicate passion, prejudice, or mistake. *Id*.

The present case bears a greater resemblance to *Jones v. Meyer*, 256 Neb. 947, 594 N.W.2d 610 (1999), than to *Springer v. Bohling, supra*. Here, Harry reported no pain on the day of the accident, but he developed neck pain within 3 or 4 days. During the first month following the accident, he saw his family physician on two occasions for neck pain. At the second visit, the physician ordered an X-ray, which showed "[m]oderately severe degenerative change" in the cervical spine. Despite Harry's complaints of pain and the findings on the X-ray, Harry received no treatment for his neck pain at the time. Harry again complained of neck pain during an office visit with his family physician in May 2009, but his medical records reveal no other complaints of neck pain for the remainder of 2009, 2010, or 2011. The medical bills for Harry's initial two visits to his family physician following the accident totaled $307, which is the amount of the jury's verdict. Clearly, the jury found that these initial visits were fair, reasonable, and necessitated by

the accident. However, the jury did not reach the same conclusion with respect to the medical bills incurred beginning in July 2012, when Harry next sought treatment for his neck pain. The jury's conclusion in this respect finds support in the evidence, as we explain.

Significantly, Dr. Anderson testified that although he spoke with Harry about his neck pain during "almost each and every" visit, he did not record Harry's complaints of neck pain in his medical notes until an office visit on July 27, 2012. According to Dr. Anderson, during that visit, Harry complained of intermittent neck pain that occasionally woke him up at night. The doctor explained that he recorded the complaints in his medical notes because it was the first time that Harry reported a worsening of his neck pain and requested a referral to a chiropractor. The record contains no explanation as to why Harry's neck pain became worse in July 2012, necessitating chiropractic treatment for the first time. It was for the jury to determine the significance of the years-long gap in Harry's treatment, and we cannot say that the jury ignored the evidence or was motivated by passion, prejudice, or mistake in returning a verdict that did not include the medical bills incurred following the lengthy gap in treatment.

We also note that although Dr. Anderson testified that his opinion within a reasonable degree of medical certainty was that Harry's neck problems resulted from the January 2009 car accident, he testified on cross-examination that the MRI of Harry's neck completed in May 2014 showed degenerative changes, as well as stenosis that was not "very severe or serious." Dr. Anderson then admitted that degenerative changes could cause neck pain even in the absence of a traumatic event. The jury could have relied on this testimony in determining that Harry's complaints of worsening neck pain in July 2012, as well as his subsequent chiropractic treatments and physical therapy, were not attributable to the accident in January 2009. Dr. Anderson also testified on cross-examination that Harry had been diagnosed with sleep apnea but had not received treatment for that condition, which gave the jury a reason to question Harry's testimony that his neck pain was the cause of his sleeping difficulties.

In sum, this is not a case, like *Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002), in which the jury ignored evidence clearly establishing that a plaintiff's medical expenses incurred immediately following an accident were necessitated by the accident. Rather, this case is more similar to *Jones v. Meyer*, 256 Neb. 947, 594 N.W.2d 610 (1999), in which the jury relied on gaps in the plaintiff's treatment and other evidence to conclude that not all of the plaintiff's medical treatment was necessitated by the underlying accident. We conclude that the jury's verdict was supported by the evidence and should be affirmed.

*Motion for New Trial.*

The Almonds' only arguments in support of their third assignment of error--that the district court erred in overruling their motion for a new trial--are that the jury's verdict was inadequate and that the district court erred in denying their motion to continue trial. Because we have addressed both of these arguments, we need not address them again in the context of reviewing the denial of the motion for new trial. The court did not abuse its discretion in denying the motion.

CONCLUSION

For the following reasons, we affirm the judgment of the district court for Sarpy County.

AFFIRMED.